AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,

v.

UNITED STATES, et al., Defendants.

No. CIV.A.2000–936 RMU.

United States District Court, District of Columbia.

June 30, 2000.

Anne Wagner, American Federation of Government Employees, AFL–CIO, Washington, D.C., for plaintiffs, the AFL–CIO's American Federation of Government Employees, AFGE Local 2263 of Albuquerque, New Mexico, AFGE Local 153 of Tampa, Florida, Ms. Rose Reed, Ms. Inez Marquez and Mr. Romero.

Daniel Van Horn, Assistant United States Attorney, Washington, D.C., for defendants, the United States and the Secretary of the United States Air Force.

Harvey A. Levin, Birch, Horton, Bittner and Cherot, P.C., Washington, D.C., for intervenor-defendants, Chugach Management Services and Chugach Management Services Joint Venture.

### ORDER
**Denying the Plaintiffs' Application for a Preliminary Injunction; Dismissing the Complaint as to MacDill AFB for Lack of Standing**

URBINA, District Judge.

## I. INTRODUCTION

This matter comes before the court on a complaint and application for a temporary restraining order ("TRO") filed by the American Federation of Government Employees of the AFL–CIO ("AFGE"), AFGE Local 2263 of Albuquerque, New Mexico and Local 153 of Tampa, Florida ("the Locals"), Ms. Rose Reed, Ms. Inez Marquez and Mr. Daniel Romero (collectively "the plaintiffs"). The instant controversy concerns contracts for civil-engineering and maintenance work at the Kirtland U.S. Air Force Base in Albuquerque, New Mexico ("Kirtland") and the MacDill U.S. Air Force Base in Tampa, Florida ("MacDill").

The defendants are the United States and U.S. Air Force Secretary F. Whitten Peters (collectively "the Air Force") and two corporations owned by Native Americans, Chugach Management Joint Venture and Chugach Management Services, Inc. (collectively "Chugach"). The Air Force plans to award the Kirtland contract to Chugach on the basis of a federal statute which grants preferential treatment to firms owned by Native Americans. Similarly, in June 1999 the Air Force used the statutory preference to award the MacDill contract to Chugach, and it plans to renew that contract this year.

The plaintiffs seek to enjoin the Air Force from using the preference in favor of Native–American firms to award the Kirtland contract or renew the MacDill contract, on the ground that the preference violates their Fifth Amendment rights to Equal Protection of the law. The challenged preference is section 8014(3) of the Fiscal Year 2000 Defense Appropriations Act. Pub.L. No. 106–76,

enacted October 25, 1999, 113 Stat. 1212, 1234 ("Section 8014"). The court heard oral argument on June 22, 2000.

For the reasons which follow, the court will deny the plaintiffs' application for a preliminary injunction as to both Kirtland and MacDill Air Force Bases. In addition, the court will dismiss the complaint as to MacDill for lack of standing. The complaint survives to the extent that it challenges the contemplated use of the section 8014 preference at Kirtland.

## II. BACKGROUND

*The Plaintiffs.* The individual plaintiffs are civilian Department of Defense ("DOD") employees assigned to the 377th Civil Engineer Group (CEG) at Kirtland AFB. The 377th CEG performs functions at Kirtland ranging from electrical work, electronics, carpentry, heating and air conditioning, heavy-equipment maintenance, landscaping and grounds maintenance, fleet, metal shop and construction, refuse pick-up and disposal, custodial services, septic-tank service and street-sweeping. *See* Affidavit of Rose Reed ("Rose Aff.") ¶¶ 1, 17; Air Force's Opposition to the Plaintiffs' Application for a Preliminary Injunction ("AF's Opp. to PI"), Ex. 2, ¶ 3 (Decl. of Col. Polly A. Peyer dated May 15, 2000).

*Kirtland Contract.* The parties agree that absent section 8014, the Air Force's decision whether to contract out work customarily would be based on a cost/efficiency analysis and a competitive bidding process. Indeed, in December 1998 the Air Force announced that the 377th CEG at Kirtland AFB would undergo a study to determine whether it would be efficient and cost-effective to contract out the base-maintenance work currently performed by DOD employees. *See* Mot. for PI, Ex. 3 at 3. (The parties refer to contracting out as "direct conversion.") The analysis was to be conducted according to, *inter alia,* the

requirements of 10 U.S.C. § 2461 and Office of Management and Budget Circular A–76 ("Circular A–76").

As described by Circular A–76, the competitive bidding analysis would consist of six steps: (1) the development of a performance work statement; (2) the performance of a management study to determine the government's "Most Efficient Organization"; (3) the development of an estimate of an in-house cost estimate (what it would cost for the government employees to do the job); (4) issuance of a Request for Proposals or Invitation for Bid; (5) comparison of the in-house bid against a private contractors' bid; and (6) an administrative appeals process. *See* Mot. for PI, Ex. 2. (Circular No. A–76 Rev. Supp. Handbook, Part I, Ch. 3, Supplement). A private contractor, such as Chugach, would have to beat the in-house bid by at least 10% in order to win the contract away from the government employees. *Id.* In response to the announcement about the A–76 study, a team of civilian employees began to develop the government's "Most Efficient Organization" plan in January 1999. *See* Reed Aff. ¶ 5.

Before the Kirtland employees made much progress on their proposal, however, the Air Force suspended the A–76 process. The Air Force declared its intention to forgo the customary process and instead award the civil-engineering contracts to private firms owned by Native Americans. The Air Force solicited capability statements from three Native–American–owned firms and ultimately selected Chugach Alaska Corporation ("Chugach").[1] *See* Mot. for PI, Ex. 3 at 9. On September 20, 1999, Air Force headquarters approved Kirtland's request for the direct conversion of the civil-engineering contract. *See* Mot. for PI, Ex. 4.

---

**1.** By Order dated May 3, 2000, the court granted leave for Chugach to intervene as

defendants.

*MacDill Contract.* The Air Force also effected direct conversion of contracts for work at MacDill AFB. The Air Force had initially performed an A–76 analysis on MacDill's civil-engineering functions, and twenty-four interested contractors responded. For their part, the MacDill employees submitted their bid in an attempt to keep the work "in house." At that juncture, the Air Force discontinued the A–76 bidding process. On June 15, 1999, the Air Force awarded the MacDill contract to the intervenor-defendant, Chugach Management Services Inc., a Native–American–owned company which is a subsidiary of Chugach Alaska Corporation. The contract will have a ten-year renewal option valued at approximately $500 million. *See* Plaintiffs' Mem. in Support of Application for a Prelim. Injunction ("Mot. for PI") at 4 n. 3.

The plaintiffs allege that the direct conversions in favor of Chugach will cause the plaintiffs to be removed, downgraded or forced to retire from their government positions. *See* Reed Aff. ¶ 18–19; Marquez Aff. ¶ 8 (Pl.'s Ex. 5); Romero Aff. ¶ 7 (Pl.'s Ex. 6).

*Section 8014.* As authority for this course of action the Air Force cites section 8014(3) of the Fiscal Year 2000 Defense Appropriations Act, Pub.L. No. 106–76, enacted October 25, 1999, 113 Stat. 1212, 1234 ("the section 8014 preference"). Section 8014 generally prohibits the armed forces from contracting out work to a private contractor without first preparing an analysis showing that to be the "most-efficient and cost-effective" means of getting the work done. Section 8014 provides, in pertinent part,

> [N]one of the funds appropriated by this Act shall be available to convert to contractor performance an activity or function of the Department of Defense that . . . is performed by more than 10 De-

partment of Defense civilian employees until a most efficient and cost-effective organization analysis is completed on such activity or function . . . .

Pub.L. No. 106–79, § 8014. Section 8014 makes an exception, however, which allows the armed forces to bypass the usual efficiency/cost analysis in favor of contracting firms which are majority-owned by Native Americans. Section 8014 provides:

> [T]his section . . . shall not apply to a commercial or industrial type function of the Department of Defense that . . . (3) is planned to be converted to performance by a qualified firm under 51 percent Native American ownership.[2]

*Id.* The court will refer to this latter provision as "the section 8014 preference."

*The Controversy.* The plaintiffs contend that the section 8014 preference constitutes a racial preference which is subject to strict scrutiny under the Equal Protection guarantee of the Fifth Amendment. Alternately, the plaintiffs contend that the preference violates their fundamental property right, as federal employees, not to be terminated without just cause. They point out, correctly, that government measures which burden fundamental rights are subject to strict scrutiny for Equal Protection, just as racial classifications are. The plaintiffs further contend, of course, that the preference cannot withstand that strict scrutiny and thus must be stricken as unconstitutional. Specifically, the plaintiffs contend that the preference does not serve the state interest in redressing discrimination against Native Americans, because there is no evidence that Congress enacted the preference in response to evidence of specific, identifiable discrimination against Native Americans in federal contracting. The plaintiffs further contend that the preference is not "narrowly tailored" to serve that interest, as classifications subject to strict scrutiny must be.

---

**2.** According to an affidavit submitted by the Commander of the 377th Air Base Wing, which includes the 377th CEG, "significant savings over the cost of in-house performance of the civil engineering function are projected." AF's Opp. to PI, Ex. 2, ¶ 4 (Decl. of Col. Polly A. Peyer dated May 15, 2000).

The Air Force responds that the Section 8014 preference is a political classification, not a racial classification. Consequently, the Air Force argues, the preference should be subject only to rational-basis scrutiny. Under that standard, the Air Force contends, the court must uphold the section 8014 preference unless it finds that it has no rational relation to the government's historic interest in protecting and favoring Native Americans.

## III. LEGAL STANDARD

### A. *Standing*

The judicial power of the United States courts is limited to the resolution of "cases" or "controversies." *See* U.S. Const. Art. III, § 2, cl. 1. No justiciable case or controversy exists unless the plaintiffs have standing to sue. The prerequisites for standing reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). Namely, to establish standing under Article III.

> at an irreducible minimum . . . the party who invokes the court's authority [must] 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant', and that the injury 'fairly can be traced to the challenged action' and 'is fairly likely to be redressed by a favorable decision.'

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (footnotes and citations omitted); *MD Pharmaceutical, Inc. v. DEA*, 133 F.3d 8, 11 (D.C.Cir.1998). First, the plaintiffs must show that they have or will suffer some " 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Allegations of speculative future injury do not suffice. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Tenacre Foundation v. INS*, 892 F.Supp. 289, 294 (D.D.C.1995), *aff'd*, 78 F.3d 693 (D.C.Cir.1996). A future injury satisfies the "imminence" requirement only if the injury is "certainly impending." *Lujan*, 504 U.S. at 565 n. 2, 112 S.Ct. 2130.

Second, to show that the alleged injury is "fairly traceable" to the challenged action, the plaintiffs must make a "reasonable showing that 'but for' defendants' action the alleged injury" will not occur. *See Warth v. Seldin*, 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Community Nutrition Instit. v. Block*, 698 F.2d 1239, 1247 (D.C.Cir.1983), *rev'd o.g.*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *see, e.g., Ellsworth Assocs. v. United States*, 926 F.Supp. 207 (D.D.C. 1996) (contractor lacked standing to challenge constitutionality of SBA set-aside program for "socially and economically disadvantaged" small businesses, because its inability to compete for a contract stemmed from fact that its eligibility had expired, not from set-asides). The plaintiffs will be found to lack standing if the court must accept speculative inferences and assumptions in order to connect the alleged injury with the challenged action. *See National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228 (D.C.Cir.1987). Lastly, to prove that the alleged injury is likely to be redressed by a favorable decision, the plaintiffs must show that a favorable decision would likely afford them relief from the injury.

### B. *Preliminary Injunctive Relief*

A preliminary injunction may be granted only when the movant demonstrates that:

> (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the oth-

er party; and (4) the public interest will be furthered by an injunction. *Davenport v. International Brotherhood of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999); *see also Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir.1998); *World Duty Free Americas, Inc. v. Summers,* 94 F.Supp.2d 61, 64 (D.D.C.2000); *ANADAC, Inc. v. INS,* 44 F.Supp.2d 306, 308 (D.D.C.1999). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive· as to whether preliminary injunctive relief is warranted. *See CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). Rather, the factors "interrelate on a sliding scale and must be balanced against each other." *Davenport,* 166 F.3d at 361 (citing *Serono Labs. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998)); *see also WMATA v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

In other words, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *See Serono Labs. v. Shalala,* 158 F.3d 1313, 1318 (D.C.Cir.1998). For instance, as to the first factor, "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the movants'] view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson,* 39 F.Supp.2d 48, 50 (D.D.C.1999) (quoting *Holiday Tours,* 559 F.2d at 843).

■ If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC,* 56 F.3d 1497, 1506 (D.C.Cir.), *amended o.g. on reh'g,* 66 F.3d 1226 (D.C.Cir.1995). It is particularly important for the plaintiffs to demonstrate a substantial likelihood of success on the merits. If the plaintiffs fail to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport,* 166 F.3d at 367 (citing *Murrow Furniture Galleries v. Thomasville Furniture Indus.,* 889 F.2d 524, 527 (4th Cir.1989)); *see, e.g., National Pharmaceutical Alliance v. Henney,* 47 F.Supp.2d 37, 41 (D.D.C.1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their motion."). Indeed, in this Circuit a "substantial indication" of likely success on the merits is a *sine qua non* of preliminary injunctive relief. Absent such a substantial indication, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *American Bankers Ass'n. v. National Credit· Union Admin.,* 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting *Holiday Tours,* 559 F.2d at 843).

■ Lastly, any injunction which the court issues must be carefully circumscribed and tailored to remedy the harm shown. *See National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 977 (D.C.Cir.1990) (citing *Gulf Oil Corp. v. Brock,* 778 F.2d 834, 842 (D.C.Cir.1985)).

## C. *Levels of Equal Protection Review*

### 1. *Strict Scrutiny for All Racial Classifications*

■ "The concept of equal justice under law requires the State to govern impartially." *Lehr v. Robertson,* 463 U.S. 248, 265, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (citing *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979)). To ensure such impartiality, the Fourteenth Amendment to the U.S. Constitution provides, in pertinent part, that no State shall "deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const., Am. XIV.[3] In this vein, "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (citing *Strauder v. West Virginia*, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880)). The Supreme Court has clearly stated, "Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category." *Palmore*, 466 U.S. at 432, 104 S.Ct. 1879 (citing *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). Accordingly, the Supreme Court has declared that "[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citing *Brown v. Board of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873).

■ Specifically, government classifications "that expressly distinguish[ ] among citizens because of their race [must] be narrowly tailored to further a compelling governmental interest." *Shaw v. Reno*, 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (citation omitted). Alternately, it has been said that such a classification must be "precisely" tailored. *See Malabed v. North Slope Borough*, 42 F.Supp.2d 927, 936 (D.Alaska 1999) (citing *Hoffman v. United States*, 767 F.2d 1431, 1434 (9th Cir.1985)). Both the compelling-

interest and narrowly tailored requirements apply to all race-based measures, even federal measures designed to redress racial discrimination. *See Graceba Total Communications v. FCC*, 115 F.3d 1038, 1040–41 (D.C.Cir.1997) (citing *Adarand Constructors v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).

To be narrowly tailored, "there must be a sufficient nexus between the compelling governmental interest" and the challenged measure. *Hutchins v. D.C.*, 144 F.3d 798, 805 (D.C.Cir.) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)), *vac'd o.g.*, 156 F.3d 1267 (D.C.Cir.1998). Moreover, the measure "must use the least restrictive reasonable means to achieve its goals ...." *Hutchins*, 144 F.3d at 805 (citing *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)); *see, e.g., Lutheran Church–Missouri v. FCC*, 141 F.3d 344 (D.C.Cir.1998) (even if FCC's stated interest in fostering diverse programming content was compelling, its race-conscious EEO regulations were not narrowly tailored to serve that interest, because regulations reached all levels of employees, not just high-ranking employees, but there was no evidence linking low-level employees to programming content). To determine whether the measure uses the least restrictive means available, the court inquires "whether less restrictive alternatives to the [measure] would accomplish the government's goals equally or almost equally effectively ...." *Blount v. SEC*, 61 F.3d 938, 944 (D.C.Cir.1995) (citing *Sable Communications v. FCC*, 492

---

**3.** By its terms, the Fourteenth Amendment does not apply to the federal government. The Due Process Clause of the Fifth Amendment, however, has been read to contain a guarantee of equal protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). It is that Fifth Amendment guarantee which applies to the federal government. The Fifth Amendment Due Process Clause's guarantee of equal protection is coterminous with the Fourteenth Amendment Equal Protection Clause: "if a classification

would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment." *Taxation with Representation v. Blumenthal*, 1981 WL 21149, *3 n. 13 (D.C.Cir.1981) (quoting *Johnson v. Robison*, 415 U.S. 361, 364, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)). Accordingly, in evaluating the plaintiff's Fifth Amendment equal protection claim, the court considers decisions interpreting the Fourteenth Amendment Equal Protection Clause.

U.S. 115, 130–31, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)).

### 2. Strict Scrutiny for Measures Which Burden Fundamental Rights

■ In addition, a measure which burdens or intrudes upon a fundamental right will be subject to strict scrutiny, without regard to whether the measure imposes a racial classification. *See Hutchins v. D.C.*, 188 F.3d 531, 535 (D.C.Cir.1999) ("Since the [challenged juvenile] curfew intrudes on minors' right to free movement, as well as on the parents' fundamental rights to direct their children's upbringing, it must be subjected to strict scrutiny."); *United States v. Johnson*, 40 F.3d 436, 439 n. 1 (D.C.Cir.1994); *see, e.g., Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (strict scrutiny applied to classification which burdened rights to marriage and procreation); *Blount v. SEC*, 61 F.3d 938, 942–44 (D.C.Cir.1995) (securities regulation subject to strict scrutiny because it burdened right to free speech). Unlike the far more deferential rational-basis test, "strict scrutiny's searching inquiry requires that legislatures carefully and rigorously craft suspect laws to ensure that they limit fundamental rights no more than necessary to accomplish compelling goals." *Hutchins*, 144 F.3d at 826 (Tatel, J., concurring in judgment).

### 3. Rational–Basis Review for Other Measures.

By contrast, "[i]f a legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end.'"[4] *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) (quoting *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)). The rational-basis test has traditionally proven quite deferential. As the Supreme Court has said, the rational-basis

standard is "true to the principle that the Fourteenth Amendment [or the Fifth Amendment] gives the federal courts no power to impose ... their views of what constitutes wise economic or social policy." *City of Dallas v. Stanglin*, 490 U.S. 19, 27, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (citation omitted). Legislatures are presumed to have acted constitutionally "even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classification will be set aside only if no grounds can be conceived to justify them." *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

## IV. DISCUSSION

Preliminarily, the court concludes that the plaintiffs have no standing to challenge the use of the section 8014 preference to renew the Chugach contract at MacDill Air Force Base, because none of them allege that they would be harmed by such renewal. The court concludes, however, that at least the individual plaintiffs have standing to challenge the contemplated use of the preference to award a contract to Chugach at Kirtland Air Force Base, where they work.

On the merits of the issues presented, the court concludes that on the current record, the plaintiffs are likely to persuade the court that the section 8014 preference is subject to strict scrutiny because it burdens a fundamental right. Ruling that strict scrutiny is likely to apply on this ground, the court declines to reach the plaintiffs' alternate contention that the preference must be subject to strict scrutiny as a racial classification.

The court also decides, however, that plaintiffs have not shown that they are likely to prevail on their claim that the preference fails the strict scrutiny test.

---

4. There is a third level of Equal Protection review known as intermediate scrutiny. It has been applied to classifications which are based on gender or legitimacy. Neither party contends that intermediate scrutiny should apply to the section 8014 preference.

The defendants have a strong argument that the preference can reasonably be construed as narrowly tailored to serve a compelling state interest. The court does find that the plaintiffs will suffer serious, irreparable harm if the preliminary injunction does not issue. The harm to plaintiffs, however, is offset by the substantial harm the defendants will suffer if an injunction *does* issue. Lastly, the court concludes that there are substantial public interests both for and against preliminary injunctive relief, so the public interest on balance does not favor an injunction. The court concludes that the four factors, viewed together, do not warrant the extraordinary remedy of preliminary injunctive relief.

## A. *Standing*

■ Preliminarily, the court notes that the AFGE and its Locals do not allege that they have suffered or will suffer any injury from the Air Force awarding or renewing contracts pursuant to the section 8014 preference. Accordingly, the court finds that the union plaintiffs are suing in a representative capacity only. *Cf. United Auto. Workers v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). In other words, wherever the court finds that the individual plaintiffs do not have standing, the union plaintiffs will not have standing either. The court separately considers whether the individual plaintiffs have standing to challenge the use of section 8014 at Kirtland and whether they have standing to challenge its use at Mac-Dill.

### 1. *Standing to Challenge Award of Kirtland Contract to Chugach*

#### a. *The Injury: Potential Loss of Income & Benefits*

The defendants contend that the plaintiffs lack standing to challenge its plan to award a contract to Chugach at Kirtland AFB pursuant to the section 8014 preference. The defendants emphasize that direct conversion will not cause the plaintiffs to become unemployed, because Chugach is legally required to give the plaintiffs "the right of first refusal for employment openings under the contract . . . ." *See* Air Force's Opposition to Pls.' Motion for a Prelim. Injunction ("AF's Opp. to PI") at 12 (citing 48 C.F.R. §§ 52.207–3[5] and 7.305(C)); Chugach's Opp. to PI at 3; Hobbs Decl. ¶¶ 8–9. The plaintiffs do not contest that they will have this right of first refusal. There is no indication, however, that the plaintiffs would be entitled to receive from Chugach the same salary, health-care insurance, retirement plan and other benefits which they currently enjoy as federal employees.[6] Indeed, the Air

---

**5.** This provision, which will be included in the contract itself, states,

 (a) The Contractor shall give Government employees who have been or will be adversely affected or separated as a result of award of this contract the right of first refusal for employment openings under the contract in positions for which they are qualified, if that employment is consistent within post-Government-employment conflict of interest standards.

 (b) Within 10 days after contract award, the Contracting Officer will provide to the Contractor a list of all Government employees who have been or will be adversely affected or separated as a result of award of this contract.

 (c) The Contractor shall report to the Contracting Officer the names of individuals identified on the list who are hired within 90 days after contract performance begins.

This report shall be forwarded within 120 days after contract performance begins.
Declaration of Richard Hobbs, Operations Manager of Chugach Management Services, Inc., dated May 16, 2000 ("Hobbs Decl.") ¶ 8A. Chugach submits data showing that it complied with this employee protection requirement after it was awarded the MacDill contract in June 1999. *See id.* ¶ 9.

**6.** Chugach asserts that it has tried to ameliorate the situation of federal employees who lose their federal jobs due to direct conversion, "with offers of higher-than-required wages and benefits, including . . . health benefits and a 401(k) plan" comparable to those enjoyed by the workers as federal employees. *See* Chugach's Opp. to PI at 8; Hobbs Decl. ¶ 12. Assuming this is true, it still does not confer on the plaintiffs any legal entitlement to the level of salary, retirement plan and

Force states, "The employment terms that Chugach will offer ... is entirely a matter of speculation at this time." AF's Opp. to PI at 12.

■ Consequently, the court determines that the award of the Kirtland contract to Chugach will not cause the plaintiffs to become unemployed but that it *may* cause them to suffer a diminution in salary and benefits compared to their federal employment. The court further finds that such speculative future harm does not constitute the "concrete, particularized" and "not conjectural" harm needed to satisfy the injury-in-fact element of standing. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

### b. *The Injury; Loss of Right to Compete for Contract*

The plaintiffs next contend that they have standing because the Air Force's direct conversion of the contracts to Chugach will deprive them of their right to compete for the Kirtland contract—in effect, the right to compete for continued federal employment. *See* Mot. for PI at 2; Reed Aff. ¶ 10; Marquez Aff. ¶ 7; Romero Aff. ¶ 6. The plaintiffs frame the loss of the right to compete as an injury distinct from the loss of the jobs themselves, and the court agrees this can be a valid distinction for purposes of standing. On this score the plaintiffs rely on *Northeastern Florida Chapter of Associated and General Contractors of America v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) ("*N.E. Florida Contractors*") and *Dynalantic Corp. v. Department of Defense,* 115 F.3d 1012, 1016 (D.C.Cir.1997). In *N.E. Florida Contractors,* an association of contractors raised an Equal Protection challenge to a municipal ordinance which required that 10% of the city's contracts be "set aside" for firms owned by minorities or women. The Eleventh Circuit held that the association lacked standing because it failed to demonstrate that

any of its members would have successfully bid for the contracts and, therefore, the association failed to show the requisite injury. The Supreme Court reversed, holding,

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*N.E. Florida Contractors,* 508 U.S. at 666, 113 S.Ct. 2297. Consequently, the Supreme Court ruled, a party challenging a set-aside program on equal protection grounds need only show "that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *N.E. Florida Contractors,* 508 U.S. at 666, 113 S.Ct. 2297. The D.C. Circuit employed similar reasoning in *Dynalantic,* when a defense contractor challenged the race-based set-asides in section 8(a) of the federal Small Business Act. The Circuit held that being deprived of an opportunity to compete for the set-aside contracts (and thereby being foreclosed from access to potential business) "clearly makes out an injury" for standing purposes. *Dynalantic,* 115 F.3d at 1016.

The defendants respond that "[t]here is no reason to think ... that the current civilian employees have either the opportunity or the right to band together in a unit ... to create the equivalent of a competing 'bid' for a 'contract' to perform C[ivil] E[ngineering] functions in-house." AF's Opp. to PI at 11. Therefore, the defendants contend, decisions holding that contractors have standing to challenge mea-

other benefits which they received as federal

employees.

sures which would deprive them of the opportunity to bid on a contract are inapposite. *Id.* Instead, the defendants contend, this case is more like *National Maritime Union v. Commander*, 824 F.2d 1228, 1230 (D.C.Cir.1987). There, the court found that labor unions lacked standing to void a contract and compel new bids, because it was speculative whether the company employing the unions' members would even participate in, let alone win, a new round of bidding. *National Maritime Union*, 824 F.2d at 1235–36.

█ The plaintiffs have the more persuasive argument on this issue. It is true that the plaintiffs, as individual employees and not contractors, would not have formally submitted a bid for the Kirtland civil-engineering work. Nonetheless, absent the section 8014 preference, the Air Force would have assessed the cost and efficiency of the "in-house bid" and compared it to the cost and efficiency of the private contractors' bids. This is significant because the in-house bid is essentially the "bid" of the plaintiffs and the other government employees who are currently performing the work. Thus, but for the section 8014 preference, the Air Force would have given equal consideration to the functional equivalent of the plaintiffs' "bid." So far as the record discloses, it was only the Air Force's use of the section 8014 preference which caused it not to calculate and consider the in-house bid. In short, it would be elevating form over substance to deny that the preference denied the plaintiffs the consideration they would customarily be afforded—the right to compete, on a level playing field, to keep their jobs. Thus, the court rules that the loss of the plaintiffs' right to compete for the Kirtland contract constitutes the personal, concrete, particularized and imminent injury required to establish standing. *See Cortez III Service Corp. v. NASA*, 950 F.Supp. 357, 360 (D.D.C.1996) (small business had standing to challenge decision by NASA and Small Business Administration to consider only disadvantaged businesses

for contract rather than allowing full and open competition for contract).

### c. *The Injury: Loss of Right to Continued Federal Employment Absent Just Cause for Removal*

█ In addition, the plaintiffs advance another theory of standing which the court finds meritorious. The plaintiffs contend, correctly, that federal employees have a constitutionally protected property interest in their employment. *See Arnett v. Kennedy*, 416 U.S. 134, 164–67, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Correspondingly, federal employees have a right to continued federal employment absent just cause for their removal. *See Stone v. FDIC*, 179 F.3d 1368, 1375 (Fed.Cir.1999). The defendants do not deny that direct conversion of the Kirtland work will cause the plaintiffs to lose their current federal positions. The court views this undisputed fact in light of the plaintiffs' complaint, the gravamen of which is that the section 8014 preference is a racial classification which cannot withstand strict scrutiny. If the plaintiffs are right about this, the Air Force's award of the Kirtland work to Chugach will deprive the plaintiffs of continued employment on the basis of an unconstitutional provision, which is not "just cause." The defendants might argue that the plaintiffs will not suffer any personal injury because the direct conversion will not cause the plaintiffs to become unemployed. Such an argument misses the point. The plaintiffs do not have, or claim to have, a constitutionally protected interest in employment *per se.* Rather, they have an interest in continued *federal* employment, absent good cause for their removal. The direct conversion will undoubtedly deprive the plaintiffs of that interest.

Lastly, the plaintiffs' standing is not dependent on their ability to show that they are likely to win the contract if the Air Force gives the in-house bid equal consid-

eration rather than applying the section 8014 preference. The Supreme Court's pronouncement on this issue bears repeating, "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier to establish standing." *N.E. Florida Contractors*, 508 U.S. at 666, 113 S.Ct. 2297; *see also DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C.Cir.1997).

▮▮▮ For these reasons, the court holds that such deprivation of the plaintiffs' fundamental right to continued employment (absent just cause for removal) is a personal, concrete, particularized and certainly imminent injury. *Cf. AFGE Local 2119 v. Cohen*, 171 F.3d at 466; *Sussman v. Tanoue*, 39 F.Supp.2d at 24. On this basis, too, the court concludes that the plaintiffs have standing to challenge the planned direct conversion of Kirtland work.

### 2. No Standing to Challenge Renewal of Chugach's MacDill Contract

In addition to challenging the planned award of the Kirtland contract to Chugach, the plaintiffs seek to challenge the planned renewal of Chugach's existing contract at MacDill. In contrast to Kirtland, none of the plaintiffs works at or has any discernible connection to MacDill. Thus, nothing in the record provides a basis for the court to find that the plaintiffs will personally suffer any injury if the Air Force renews Chugach's contract at MacDill pursuant to the section 8014 preference. *See* AF's Opp. to PI ("As there are no civilian employees at MacDill, Plaintiffs would not be facing any potential job loss if the contract at MacDill is renewed."). Accordingly, the court finds that the plaintiffs do not have standing to challenge the Air Force's contemplated use of section 8014 at MacDill.

For this reason, the court will deny the plaintiff's application for a preliminary injunction as to the contract at MacDill. The court also will dismiss the complaint to the extent that it seeks to challenge the use of section 8014 at MacDill.

### B. Likelihood of Success on the Merits

The plaintiffs contend that the section 8014 preference for Native–American firms is a racial classification and, as such, is subject to the rigorous "strict scrutiny" test of Equal Protection. Alternately, the plaintiffs contend that the preference burdens a fundamental right and so is subject to strict scrutiny on that ground, whether or not it is a racial classification. The defendants respond that the preference is a political classification, not a racial one, and does not burden any fundamental right. Consequently, the defendants contend, the preference is subject only to the deferential rational-basis test.

For the reasons which follow, the court is likely to conclude that the section 8014 preference is subject to strict scrutiny because it burdens a fundamental right, as the plaintiffs allege.[7] However, the court

---

7. The parties devoted much of their briefs and oral arguments to their dispute over the proper interpretation of the Supreme Court's decision in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). There, non-Indians challenged a federal statute which instituted a hiring preference in favor of Indians for positions in the Bureau of Indian Affairs ("BIA"). The preference applied to individuals who were " 'one-fourth or more degree Indian blood and ... members of a Federally-recognized tribe.' " *Mancari*, 417 U.S. at 553 n. 24, 94 S.Ct. 2474. On appeal from a three-judge district-court panel, the Supreme Court unanimously held that the preference did not violate Equal Protection.

The Court reasoned that the preference was "not directed towards a 'racial' group consisting of 'Indians,' " but rather "only to members of 'federally recognized tribes.' " *Id.* at 553 n. 24, 94 S.Ct. 2474. "In this sense," the Court held, "the preference was political rather than racial in nature." *Id.* The Court further explained, "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion."

is also likely to conclude that the preference can reasonably be construed so as to save it from constitutional infirmity. Specifically, the preference can reasonably be construed as (1) narrowly tailored (2) to serve the compelling federal governmental interest in assisting economically disadvantaged Native–American enterprises. In short, the current record suggests that the defendants are likely to prevail on the merits. Therefore, although this is not an "open-and-shut" case, the plaintiffs have not met their burden to show a substantial likelihood of success on the merits. *Cf. Washington Post Co. v. Turner,* 708 F.Supp. 405, 416 (D.D.C.1989) (denying application for preliminary injunction where, *inter alia,* "although plaintiff's ... may have some merit, plaintiff has not demon- strated the requisite likelihood of success" on the merits).

### 1. *Is the Preference Subject to Strict Scrutiny or Rational–Basis Review?*

#### a. *The Section 8014 Preference*

Section 8014(3) purports to authorize the armed forces to bypass customary cost-comparison and competitive-bidding procedures to award certain types of defense contracts directly to firms which have at least "51 percent Native American ownership." Section 8014 does not define who qualifies as a "Native American" for purposes of this preference, nor does it incorporate or refer to any provision which defines the term. On its face, the preference is not limited to firms whose owners are members of or affiliated with Native

---

*Id.* at 554, 94 S.Ct. 2474. Because the BIA preference could be "tied rationally to the fulfillment of Congress' unique obligation toward the Indians" and was "reasonably and rationally designed to further Indian self-government," the Court held it did not offend the guarantee of Equal Protection. *Id.* at 555, 94 S.Ct. 2474.

Emphasizing that the preference upheld in *Mancari* dealt with uniquely Indian affairs and interests—employment at the Bureau of Indian Affairs, the plaintiffs take *Mancari* to show that Indian preferences are subject to mere rational-basis review only if they deal with "uniquely Indian interests," such as tribal land, affairs, self-government, religion and culture. The defendants contend that *Mancari* did not change anything in existing case law on this issue: Indian preferences, they say, generally are recognized as political, rather than racial classifications, and are always subject to rational-basis review.

The court's preliminary review suggests that both sides have colorable arguments on this issue. The court notes that just this Term, the Supreme Court summarized *Mancari* in a way which suggests the plaintiffs' reading may have merit. In *Rice v. Cayetano,* — U.S. —, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), the Court summarized *Mancari* as follows: "The opinion was careful to note, however, that the case was confined to the authority of the BIA, an agency described as 'sui generis.'" *Rice,* 120 S.Ct. at 1058. Significantly, in *Rice* the Court referred to "the limited exception of *Mancari.*" *Id.*

Lastly, the Ninth Circuit appears to suggest that, to the extent *Mancari* is read to broadly exempt Indian classifications from strict scrutiny, it is inconsistent with the Supreme Court's later decision in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The Ninth Circuit recently stated, "Although we questioned *Mancari*'s continuing vitality in light of *Adarand* in *Williams v. Babbitt,* 115 F.3d 657, 663 (9th Cir.1997), ... we are bound by Supreme Court authority and our own precedent until overruled, which neither *Mancari* nor [the Ninth Circuit's decision in *Alaska Chapter, Associated General Contractors v. Pierce,* 694 F.2d 1162, 1167 (9th Cir.1982)] has been." *Rice v. Cayetano,* 146 F.3d 1075, 1081 n. 17 (9th Cir.1998), *rev'd o.g.,* — U.S. —, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).

In any event, the court's interpretation of *Mancari* could play a large role in determining whether the court finds the section 8014(3) preference to be a racial classification or a political classification. In turn, this categorization of the preference would determine the level of scrutiny the court applies to the preference. Specifically, if the court found the preference is racial, it would apply strict scrutiny; if the court found the preference is political, it would apply rational-basis review.

As mentioned above, however, the court is likely to conclude that the section 8014 preference is subject to strict scrutiny on the ground that it burdens a fundamental right. Accordingly, at this juncture it is unnecessary for the court to address whether the preference is a racial classification or a political classification.

American tribes or Alaska Native Corporations.

### b. *Alaska Natives and Alaska Native Corporations*

In 1971, Congress enacted the Alaska Native Claims Settlement Act ("ANCSA") to settle the aboriginal claims of Alaska Natives to the land and resources of the State of Alaska. *See* 43 U.S.C. § 1601 *et seq.* ANCSA required the Secretary of the Interior to divide Alaska into twelve regions, and the Natives of each region were required to form for-profit corporations under Alaska law. *See* 43 U.S.C. § 1606(a), (d). Each Native Alaskan "enrolled" in a region received 100 shares of the Regional Corporation. Chugach Alaska Corporation, the parent of defendant Chugach Management Services, Inc., is the Regional Corporation for south-central Alaska. *See* 43 U.S.C. § 1606(a)(9); Hobbs Decl. ¶ 2 (Chugach's Opp. to PI, Ex.). Through ANCSA, Congress deposited nearly $1 billion into the Alaska Native Fund for distribution among the Regional Corporations. *See* 43 U.S.C. § 1605; *Doyon v. Bristol Bay Native Corp.*, 569 F.2d 491, 494–95 (9th Cir.), *cert. den.*, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978). ANCSA also conveyed title to 40 million acres of federal land to the Regional Corporations, distributed according to their enrollment of shareholders. *See* 43 U.S.C. §§ 1611, 1613(h). Only Native Alaskans can sit on the board of an Alaska Native Corporation ("ANC"), and until 1991 shares were not alienable except among Native Alaskans. *See* 43 U.S.C. § 1606(f). The purpose of this system is to foster self-determination and financial independence among the Alaska Natives. *See* H.R. Conf. Rep. 92–746, 92d Cong., 1st Sess., 37, repr. in 1971 U.S.C.C.A.N. 2247, 2250; *City of Angoon v. Marsh*, 749 F.2d 1413, 1414 (9th Cir.1984).

*ANCs are Considered to be Economically Disadvantaged Minority Businesses.*

In 1988, Congress amended ANCSA to provide that any Native Corporation whose stock is majority-owned by Native Alaskans or their descendants "shall be considered to be a corporation owned and controlled by Natives and [shall be considered to be] a minority business enterprise ...." *See* 43 U.S.C. § 1626(e)(1). The amendment made the same provision for subsidiaries, joint ventures and partnerships of a Native Corporation, such as the Chugach defendants here. *See* 43 U.S.C. § 1626(e)(2). Chugach contends, "By adding this provision to ANCSA, Congress made federal contracting preferences part of the consideration of the complex settlement of Alaskan Natives' aboriginal claims."[8] Chugach's Opp. to PI at 19. The court reads these provisions only as rendering ANCs eligible for whatever preferences legislatures choose to accord minorities or minority-owned businesses. On their own, they do not appear to establish any preference in favor of ANCs.

In 1992, Congress further amended ANCSA to provide that ANCs are also to be considered "economically disadvantaged." *See* Pub.L. 102–415, § 10, 106 Stat. 2115 (Oct. 14, 1992). Chugach emphasizes Congress' declaration of its intent to render ANCs eligible for federal programs for economically disadvantaged minority contractors. A House of Representatives Report stated,

> The section would further clarify that Alaska Native Corporations and their subsidiary companies are minority and economically disadvantaged business enterprises for the purposes of qualifying for participation in the federal contracting and subcontracting programs, the largest of which include ... [the Small Business Administration's "section 8(a)" program][9] and the Department of De-

---

**8.** The court rejects any implication that designating ANCs as minority enterprises influences the level of Equal Protection scrutiny

which should be accorded to a measure favoring Native Americans or ANCs.

**9.** The defendants were incorporated for the purpose of benefitting from government con-

fense Small and Disadvantaged Business Program.

> H.R.Rep. No. 102–673, 138 Cong. Rec. 1450, 1456 (1992). Like the 1988 amendment, the court considers the 1991 amendment merely to render ANCs eligible for preferences which legislatures may choose to establish in favor of economically disadvantaged or minority individuals or firms. The 1991 amendment itself does· not appear to establish any preference for ANCs or Native Americans.

Lastly for our purposes, ANCSA clarifies that "Notwithstanding any other provision of the law, Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans." 43 U.S.C. § 1626(d).

In light of the United States' unique guardian-ward relationship with the American Indians and its agreements with the Alaska Natives, the defendants argue,

> Because § 8014(e) effects the preference Native American entities enjoy under ANCSA ..., it is logically limited to those Native–American–owned firms that qualify under those programs. The most obvious of these are Alaska Native Corporations, which Congress has deemed to be disadvantaged for the express purpose of making them eligible for contract preference as part of the ANCSA settlement. * * * Because § 8014(3) is integrally tied to ... ANCSA § 1626 ... it cannot be read as a racial preference, .... Instead, § 8014(3) is part of and limited by a larger scheme and purpose, to create a preference in favor of Native American entities (which include Native corporations ...) set up to further their social and economic self-determination.

Chugach Opp. to PI at 25. The defendants urge the court to "construe § 8014 to limit it to this situation." Chugach Opp. to PI at 25–26. As outlined below, the court is inclined to adopt the limiting con-

struction of the section 8014 preference which is urged by the defendants.

### 2. Strict Scrutiny of Section 8014 Preference

### a. Is Preference Narrowly Tailored to Further the Interest in Assisting Disadvantaged Native–American Enterprises?

The strict-scrutiny test enables the judiciary to " 'smoke out' illegitimate uses of race by ensuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (invalidating city program which set aside percentage of government-construction contracts for minorities). At this juncture it appears likely that the court will find that section 8014's nominally unqualified preference for Native Americans *can* reasonably be construed to withstand strict scrutiny.

### i. Construction of Section § 8014 Preference

 The defendants urge that the court can and should construe the section 8014 preference so as to avoid any serious question of constitutional infirmity. The court agrees that there is a long-standing rule that courts should construe challenged enactments so as to avoid constitutional infirmity whenever reasonably possible. At this juncture the court is also inclined to agree with the defendants that it can reasonably construe the section 8014 preference to save it from constitutional infirmity.

The Air Force contends, "Even if the term 'Native American' in § 8014 arguably could be construed to include persons or entities who are not affiliated with Indian tribes or Alaska Native Corporations, this Court must assume that Congress intended for its legislation to steer clear of the more serious constitutional issues that

---

tracts awarded under the Small Business Act section 8(a) program, and both are participat-

ing therein. *See* Hobbs Decl. ¶ 5 (Chugach's Opp. to PI, Ex.).

might be implicated by a broader interpretation." AF's Opp. to PI at 31 (citation omitted). Specifically, the Air Force urges the court to "assume that § 8014 would only be applied to 'Indians' who are affiliated with recognized tribal entities or to A[laska] N[ative] C[orporation]s." *Id.* The Air Force emphasizes that it has only used the section 8014 preference twice, both times in favor of the Chugach defendants, which are owned by an Alaska Native Corporation. *Id.* and Ex. 3, Decl. of Vincent A. Gasaway dated May 17, 2000 ("There are no other instances where this provision, or the same provision in earlier appropriations acts, has been used by the Air Force to conduct A–76 direct conversions.").

It is well settled that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the proper course by the court] is to adopt the latter." *Jones v. U.S.,* 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *see also Waterview Management Co. v. FDIC,* 105 F.3d 696, 701 (D.C.Cir.1997). The plaintiffs have presented no ground for departing from this established rule of jurisprudence, and the court discerns none.

ii. *Narrowly Tailored to Further Compelling Interest in Fulfilling Obligations to Disadvantaged Indians?*

■ Applying this canon of construction, the court concludes that it is likely to decide that the section 8014 preference is constitutional. First, although the preference on its face is not restricted to enterprises which are owned by tribal members or affiliated with Native–American tribes, it has never been used to favor an enterprise which was not owned by or affiliated with a tribal entity. Rather, it appears that the armed forces have used the section 8014 preference only twice—both times to benefit Chugach, which is an Alaska Native Corporation. According to the federal legislation which created and defines Alaska Native Corporations ("ANCs"), ANCs are to be considered "economically disadvantaged" enterprises as a matter of law. Thus, as applied, the preference has been used only to favor an economically disadvantaged Native–American enterprise. In so doing, the preference serves to benefit a disadvantaged Native–American business both directly and indirectly. By affording the Native–American enterprise opportunities it otherwise might not have had, the preference reasonably can be expected to improve the enterprise's skills and business connections. Also important from a contractor's perspective, use of the preference to give Chugach contracts will give Chugach a "track record", a good reputation and a reference which it may use in bidding for other contracts—perhaps contracts in the private sector, where the preference does not apply. *See* S.Rep. No. 149, 106th Cong., 1st Sess. (Sept. 8, 1999) (noting that the "lack of a vigorous private sector [is] a major impediment to Native American economic progress"). The revenues, experience and opportunities which accrue to Chugach from the use of the preference will tend to improve both its material circumstances and its prospects for the future. *Cf. Pierce,* 694 F.2d at 1170 ("One of the most serious problems on the Indian reservations is the inadequate availability of the financial resources to permit Indian people to develop their own resources and potential") (quoting H.R.Rep. No. 93–907, 93d Cong., 2d Sess., at 607).

As the Ninth Circuit has held in upholding a Native–American preference, "encouraging and assisting Indian-owned businesses helps develop ... leadership and furthers the government's trust obligations to help the Indians develop economic self-sufficiency." *Pierce,* 694 F.2d at 1170. It is logical that the section 8014 preference be used to favor an Alaska Native Corporation, then, because ANCs were created precisely to promote economic development and self-sufficiency among Alaska Native Americans. *See Koniag, Inc. v. Koncor Forest Resource,* 39 F.3d

991, 996–97 (9th Cir.1994) (unlike other corporations, ANCs are vehicles for ensuring self-determination for Alaska Natives and for fulfilling the federal government's trust obligations to Native Americans in Alaska). Thus, the court could reasonably conclude that the section 8014 preference, as applied, furthers the compelling federal interest in encouraging economic development and self-sufficiency among the Native Americans, enabling Native Americans to better compete in the economic mainstream and better provide for their own needs and wants. *See, e.g.,* 43 U.S.C. § 1606(r) (Congress "expressly authorized and confirmed" the use of revenues generated by the ANCs' activities "to promote the health, education or welfare of ... shareholders."). More broadly, the preference furthers the federal government's compelling interest in fulfilling its trust obligations to the Alaska Native–American tribes—an interest and obligation which arises from the unique guardian-ward relationship which exists between the government and the tribes.

The court could also reasonably conclude that the preference, as applied, is narrowly tailored to serve that compelling interest. *See Blount v. SEC,* 61 F.3d 938, 944 (D.C.Cir.1995) (court inquires whether "the recited harms are real, not merely conjectural, and ... the [challenged] regulation will in fact alleviate these harms in a direct and material way"). The preference has never been used to benefit an enterprise which is owned by someone who is of the Native–American race but does not hold tribal membership or affiliation. Nor has the preference been used to benefit Native–American enterprises generally without regard to their economic and social circumstances. To the contrary, the preference has in practice benefitted only an economically disadvantaged Native–American business. Such a measure directs the financial resources and social benefits flowing from the preference to the place where Congress determined those benefits are most sorely needed: *disadvantaged* Native–American enterprises.

*See* 43 U.S.C. § 1602(b) (Act which created Alaska Native Corporations and defined them as disadvantaged enterprises was enacted "in conformity with the real economic and social needs of Natives").

In short, if the section 8014 preference is construed as it has been applied, it is likely to pass strict scrutiny. That, in turn, would prevent the plaintiffs from mounting a successful facial challenge to the preference. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("the challenger must establish that no set of circumstances exists under which the Act would be valid"); *see, e.g., James Madison, Ltd. v. Ludwig,* 82 F.3d 1085, 1100 (D.C.Cir.1996) (where plaintiff could not establish that statutory provision had been unconstitutionally applied in his case, his facial challenge to the statute would be futile); *Chemical Waste Management v. EPA,* 56 F.3d 1434 (D.C.Cir.1995). Thus the plaintiffs have not made a "substantial indication" of success on the merits, let alone shown a "substantial likelihood," so they fail to meet the first of the four criteria for preliminary injunctive relief.

## C. *Irreparable Harm and the Balance of Harms*

### 1. *Irreparable Harm to Plaintiffs in Absence of Preliminary Injunction*

#### a. *Loss of Income and Benefits*

The plaintiffs contend, plausibly, that they will suffer irreparable harm if the court does not enjoin the Air Force from awarding contracts to Native–American firms pursuant to the section 8014 preference. Specifically, the plaintiffs explain that they will lose their positions as federal employees, depriving them not just of their income but also of their health insurance, retirement annuities and other benefits. *See* Pls.' Mot. for PI at 15–16. The court recognizes that a temporary loss of income which can later be rectified, ordinarily does not constitute irreparable harm for

purposes of preliminary injunctive relief. There are cases, however, "in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *see, e.g., Robinson v. D.C.,* 1997 WL 607450 (D.D.C.1997) (granting preliminary injunction against termination of police officer); *Truck Drivers, et al. v. Almarc Mfg.,* 553 F.Supp. 1170, 1173 (N.D.Ill.1982) (potential mortgage foreclosure and "serious difficulty in sustaining the needs of everyday life" were irreparable injury); *Gonzalez v. Chasen,* 506 F.Supp. 990, 999 (D.P.R.1980) (loss of health-care coverage and employee's status as sole wage earner were circumstances constituting irreparable harm).

In this case, beyond the serious harm occasioned whenever an employee is terminated, the plaintiffs present evidence that Ms. Marquez is the sole wage-earner in her household, which includes her disabled husband, *see* Marquez Aff. ¶ 9. Similarly, while plaintiff Reed could apply for "discontinued-service" retirement, that would entail a permanent reduction in her annuity which might not be reversible even if the court ultimately declares the section 8014 preference unconstitutional and she regains her position. *See* Reed Aff. ¶ 20.

Moreover, the plaintiffs present a persuasive argument that if the injunction does not issue but the court ultimately invalidates the section 8014 preference, they might be precluded from suing the federal government to recoup pay and benefits they lost before the court so ruled. *Cf. Haley v. Pataki,* 883 F.Supp. 816, 823 (N.D.N.Y.), *app. dis.,* 60 F.3d 137, 139 (2d Cir.1995) (finding irreparable harm to employees whom Governor refused to pay because legislature failed to pass budget, because Eleventh Amendment would bar employees from later federal suit to recoup pay lost). This is because the Back Pay Act, 5 U.S.C. § 5596(b)(1)(A), entitles federal employees to recoup back pay only when they have been "affected by an unjustified or unwarranted personnel action." Here, if the preliminary injunction does not issue, the Air Force will be awarding contracts to Chugach (effectively eliminating plaintiffs' positions as federal employees) in reliance on specific Congressional authorization to do so. Even if the court ultimately held that section 8014 is unconstitutional, there is a substantial risk that a court would find that the Air Force's action was not "unjustified or unwarranted" when taken. In *Jankowitz v. United States,* 209 Ct.Cl. 489, 533 F.2d 538 (1976), for instance, the federal government suspended an employee indefinitely, pursuant to a statutory provision authorizing such action where there is reason to believe the employee has committed a felony, 5 U.S.C. § 7513. When the employee was acquitted of the felony charge, the employer reinstated him with back pay from the time of his acquittal. The employee sought back pay for the period between his suspension and his acquittal/reinstatement, on the ground that his acquittal showed he should not have been suspended. The court rejected the employee's claim, holding that the suspension was lawful when imposed and the acquittal did not retroactively render the suspension "unjustified or unwarranted" within the meaning of the Back Pay Act. Likewise here, even if the court eventually invalidates the Air Force's use of the section 8014 preference to contract out the plaintiffs' jobs, a court could well conclude that the Air Force's action was neither "unjustified" nor "unwarranted" when taken, in light of the Air Force's understanding of its seemingly clear authority under the law at that time.

### b. *Loss of Right to Continued Federal Employment Absent Just Cause for Removal*

For these reasons, the court rules that the plaintiffs have adequately demonstrated that they would suffer serious and irreparable harm if the court denied their request for a preliminary injunction.

## 2. Harm to Defendants if Preliminary Injunction Issues

The plaintiffs contend that issuance of the preliminary injunction will not cause any disruption in the civil-engineering functions at Kirtland AFB, because they "are asking only for *prospective* enforcement of a legally valid procurement process." *See* Pls.' Mot. for PI at 18. At first blush, this argument seems to have merit. After all, if the injunction issues, the civil-engineering/maintenance functions at Kirtland will continue to be performed by the federal employees who perform those functions now—until and unless the court rules that the Air Force may constitutionally award the contract for those functions to Chugach on the basis of the section 8014 preference. *See Cortez III Service Corp. v. NASA,* 950 F.Supp. 357, 363 (D.D.C. 1996) (preliminary injunction "will not harm the defendants because the work . . . will continue to be performed by the plaintiff who is the incumbent contractor"). That the Air Force considers the performance of those functions to be at least adequate is reflected in its continued employment of those employees (i.e., there is no evidence that the Air Force has attempted or is attempting to remove the plaintiffs or other civilian employees at Kirtland for cause on the ground that their performance is inadequate).

On the other hand, there is credible, uncontroverted evidence that enjoining the Air Force from awarding the Kirtland contract to Chugach would seriously disrupt civil-engineering operations at Kirtland. The disruption would arise from the fact that many of the 377th CEG's civilian employees have transferred out of their positions in anticipation of their work being contracted out to Chugach. *See* AF's Opp. to PI, Ex. 2 (Decl. of Col. Polly A. Peyer dated May 15, 2000) ¶ 6, ¶ 11 ("[M]any of our current employees are looking for or have already accepted other employment."), ¶ 12 (many employees are "tak[ing] authorized voluntary separation incentive pay to retire and go work for Chugach [or] register[ing] . . . for placement to another Department of Defense installation").[10]

An affidavit from the Commander of the Air Base Wing which relies on those operations explains in detail how such disruption would undermine military preparedness. *See id.* ¶¶ 3. For instance, Kirtland's civil-engineering functions support the 58th Special Operations Wing, which is "the sole provider for advanced special operations aircrew training for the Air Force and is unique in providing helicopter search and rescue training." *Id.* ¶ 3. The Commander also states that disruption of civil-engineering functions at Kirtland would impair the 898th Munitions Squadron, which is responsible for maintaining 40% of the Air Force's Protection Level 1 ("PL1") weapons stockpile and over 30% of DOD's PL1 weapons stockpile. *Id.* ¶¶ 3, 6, 6a. This is significant, because PL1 weapons resources include "Computer systems essential to the success of active nuclear missions; designated critical space and launch resources and aircraft designated to transport the President . . . ." *Id.* ¶ 6.

---

10. The court notes that the plaintiffs learned *in December 1998* of the likelihood that the Air Force's would effect a preferential direct conversion of the Kirtland contract. At that time the Air Force announced that the 377th CEG at Kirtland AFB would undergo a study to determine whether it would be efficient and cost-effective to contract out the base-maintenance work currently performed by DOD employees. *See* Mot. for PI, Ex. 3 at 3. On September 20, 1999, Air Force headquarters approved Kirtland's request for the direct conversion of the civil-engineering contract. *See* Mot. for PI, Ex. 4. Thus, it appears that the plaintiffs knew about the imminent threat of the direct conversion from at least seven months before they filed the instant complaint and application for preliminary injunctive relief (May 2000). Accordingly, the court surmises that a preliminary injunction's disruption to Air Force operations and the concomitant additional costs might have been less if the plaintiffs had sought judicial relief sooner. Specifically, perhaps fewer of the existing civil-engineering personnel at Kirtland would have been transferred out if the plaintiffs had acted shortly after the announcement of the direct conversion.

As Commander of the Air Base Wing at Kirtland, Colonel Peyer would appear to be well qualified to assess the likely impact of an injunction on the national defense, and the plaintiffs' reply does not attempt to contest her assessment. Consequently, the court credits the Air Force's claim that an injunction would seriously tend to undermine our military preparedness and response capabilities. The court treats this potential interference with the national defense as a grave harm.

Lastly, a lesser but still relevant harm would flow from the issuance of a preliminary injunction: the imposition of substantial additional costs on the taxpayer. Colonel Peyer emphasizes that if the Air Force is enjoined from awarding the Kirtland contract to Chugach, it will have to hire short-term employees to "backfill" the civil-engineering positions which civilian employees have started to vacate. The Colonel estimates that the Air Force would incur an additional $477,000 per month in unbudgeted costs for such short-term hires. *See* AF's Opp. to PI, Ex. 2, ¶ 9. Again, the plaintiffs' reply does not attempt to contest the Air Force's statements on this issue, and the court credits the Commander's declaration.

On balance, the potential harm to the plaintiffs, while serious, is outweighed by the potential harm to the defendants and to the national defense.

### D. Does the Public Interest Favor Preliminary Injunctive Relief Here?

For many of the same reasons, the court concludes that, on balance, the public interest weighs more against preliminary injunctive relief than in favor. On behalf of the plaintiffs, the court begins its analysis by recognizing the overriding public "interest in maintaining a system of laws free of unconstitutional racial classifications," *see O'Donnell Construction Co. v. D.C.,*

963 F.2d at 429, as well as measures which burden fundamental individual rights. As the Supreme Court has proclaimed, "a free people whose institutions are founded upon the doctrine of equality should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons." *Adarand Constructors v. Pena,* 515 U.S. at 227, 115 S.Ct. 2097. Applied to the facts of this case, this public interest amounts to an interest in ensuring that federal employees are not deprived of their jobs, or their right to compete fairly for their jobs, because of their race. If the plaintiffs appeared likely to succeed on their claim that the section 8014 preference is a racial classification which violates Equal Protection, this public interest would be implicated. As discussed above, however, the court has determined that the plaintiffs are not likely to succeed on their claim.

On the defendants' side of the ledger, the court recognizes that there is a compelling public interest in fulfilling the obligations which come with the federal government's unique guardian-ward or "trust" relationship with Native Americans and their tribes. Applied to the facts of this case, this includes the public interest in assisting economically disadvantaged Native American enterprises. As discussed above, Congress has declared by statute that Alaska Native Corporations, such as the Chugach defendants, are "economically disadvantaged." *See* Pub.L. 102–415, § 10, 106 Stat. 2115 (Oct. 14, 1992), amending 43 U.S.C. § 1626(e). Thus, allowing the Air Force to award the Kirtland contract to Chugach will directly further the public interest in fulfilling its trust obligations to Native Americans—more specifically, the public interest in assisting economically disadvantaged Native–American enterprises.[11]

---

11. Congress has also declared that Alaska Native Corporations are to be considered "minority businesses." *See* Pub.L. 102–415,

§ 10, 106 Stat. 2115 (Oct. 14, 1992), amending 43 U.S.C. § 1626(e). The court does not address the existence or scope of the public

Lastly, as discussed above, there is evidence that an injunction would seriously disrupt civil-engineering operations at Kirtland. The disruption would arise from the fact that many of the 377th CEG's civilian employees have transferred out of their positions in anticipation of their work being contracted out to Chugach. *See* AF's Opp. to PI, Ex. 2 (Decl. of Col. Polly A. Peyer dated May 15, 2000) ¶ 6, ¶ 11 ("[M]any of our current employees are looking for or have already accepted other employment."), ¶ 12 (many employees are "tak[ing] authorized voluntary separation incentive pay to retire and go work for Chugach [or] register[ing] . . . for placement to another Department of Defense installation").

An affidavit from the Commander of the Air Base Wing which relies on those operations explains in detail how such disruption would undermine military preparedness. *See id.* ¶¶ 3. For instance, Kirtland's civil-engineering functions support the 58th Special Operations Wing, which is "the sole provider for advanced special operations aircrew training for the Air Force and is unique in providing helicopter search and rescue training." *Id.* ¶ 3. The Commander also states that disruption of civil-engineering functions at Kirtland would impair the 898th Munitions Squadron, which is responsible for maintaining 40% of the Air Force's Protection Level 1 ("PL1") weapons stockpile and over 30% of DOD's PL1 weapons stockpile. *Id.* ¶¶ 3, 6, 6a. This is significant, because PL1 weapons resources include "Computer systems essential to the success of active nuclear missions; designated critical space and launch resources and aircraft designated to transport the President . . . ." *Id.* ¶ 6. As in the harm analysis, the court treats potential interference with the national defense as a major desideratum in the public-interest analysis. As evinced by the fact that the armed forces are among the few federal bodies which the Founders took

pains to specifically authorize in the Constitution, there is a strong public interest in the national defense. The court credits the Air Force's claim that an injunction would seriously tend to undermine the public interest in a prepared national defense. Lastly, a lesser but still important public interest would be impaired by a preliminary injunction: as discussed above, the Air Force would incur an additional $477,000 per month in costs if the injunction issued. *See* AF's Opp. to PI, Ex. 2, ¶ 9. This burden on the public fisc might be justified if the plaintiffs were likely to succeed in preventing the award of the contract to Chugach, but they are not.

On balance, then, the public interest weighs against issuance of a preliminary injunction.

### D. *Preliminary Injunctive Relief is Not Warranted*

In summary, the court finds that the plaintiffs have failed to justify the extraordinary remedy of a preliminary injunction. Most significantly, the plaintiffs have not shown that they are likely to succeed on the merits of their Equal Protection claim. Absent such a showing, the plaintiffs could secure preliminary injunctive relief, if at all, only by making an exceedingly strong showing on the other three factors. This the plaintiffs have not done. The plaintiffs do show that they will be irreparably harmed if the injunction does not issue, but this harm is equaled or outweighed by the harm to Chugach and to the operations of the Air Force. Lastly, the public interest weighs against a preliminary injunction.

### V. CONCLUSION

For the reasons set forth above, the court denies the plaintiff's application for a preliminary injunction as to both Kirtland

---

interest in discriminating in favor of minority businesses or economically disadvantaged businesses generally. The court limits its

analysis to the specific public interest in favoring economically disadvantaged *Native American* businesses.

and MacDill. The court also dismisses the complaint as to MacDill Air Force Base for lack of standing. An Order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously executed and issued this 30th day of June, 2000.