**FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, Defendant.**

**No. CV 03–199–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Sept. 28, 2004.

Timothy A. Bechtold, Rossbach Hart
Bechtold, Missoula, MT, For Plaintiff.

Mark Steger Smith, Office of the U.S.
Attorney, Billings, MT, For Defendant.

ORDER

MOLLOY, Chief Judge.

## I. INTRODUCTION

This case involves the Forest Service's
decision to "outsource" the work per-
formed by its Content Analysis Team
(CAT). CAT analyzes public comment for
the Forest Service, reviewing and then
coding letters, emails, and comments made
at public meetings. Plaintiff initially filed
its complaint claiming a violation of section
340(e) of Public Law 108–108, an appropri-
ations act for the Department of Interior,
which states in pertinent part:

> (e) LIMITATION ON CONVERSION
> TO CONTRACTOR PERFORM-
> ANCE.—(1) *None of the funds made
> available in this or any other Act may
> be used to convert to contractor per-
> formance an activity or function of the
> Forest Service,* an activity or function of
> the Department of the Interior per-
> formed under programs, projects, and
> activities for which funds are appropriat-
> ed by this Act, or an activity or function
> of the Department of Energy performed
> under programs, projects, and activities
> for which funds are appropriated by this
> Act, *if such activity or function is per-
> formed on or after the date of the enact-
> ment of this Act by more than 10 Feder-
> al employees unless—*
>
> > (A) the conversion is based on the
> > result of a public-private competition
> > that includes a more efficient and cost
> > effective organization plan developed
> > by such activity or function; *and*
> >
> > (B)the Competitive Sourcing Official
> > determines that, over all performance
> > periods stated in the solicitation of
> > offers for performance of the activity
> > or function, the cost of performance of
> > the activity or function by a contractor
> > would be less costly to the Federal
> > Government by an amount that equals
> > or exceeds the lesser of—
> >
> > > (i) 10 percent of the more efficient
> > > organization's personnel-related costs
> > > for performance of that activity or
> > > function by Federal employees; or (ii)
> > > $10,000,000.

117 Stat 1241, 1316–17 (emphasis added).

Plaintiff alleges injury on behalf of its
members who are members of the federal
CAT team as well its members who com-
ment on Forest Service projects. The for-
mer have an interest in their continued
employment, while the latter contend they
have an interest in having their comments
read by federal employees instead of pri-
vate sector employees who may have con-
flicts of interest.

The government counters the conflict-of-
interest allegations by stating that each
contractor is required to submit conflict-of-
interest disclosure statements for itself
and all subcontractors, in accordance with
40 C.F.R. § 1506.5. If the Contracting Of-
ficer—a government employee—deter-
mines a conflict exists that cannot be miti-
gated, the contractor will not be assigned
tasks implicating the conflict. The con-
tractor and its employees are also required
by contract to maintain confidentiality of
information, and may be required to sign

confidentiality agreements. Exhibit 13, Defendant's Motion to Dismiss.

After the government moved to dismiss, Plaintiff amended its complaint and added a claim under the Federal Activities Inventory Reform Act of 1998 (FAIR), Pub.L. No. 105–270, 31 U.S.C. § 501 (note). FAIR directs governmental agencies to classify jobs as either "inherently governmental," and therefore not subject to outsourcing, or "commercial." The CAT jobs have been consistently classified as "commercial," a classification Plaintiff now challenges.

Plaintiff moved for a preliminary injunction to prevent the contract solicitation process from occurring. That motion was not ruled on, and the solicitation process went forward, closing on March 8, 2004. Additionally, the vast majority of CAT employees were term employees, and their terms expired by the end of January 2004. The need for injunctive relief is therefore moot.

Plaintiff's primary argument is that section 340(e) of the appropriations act required the Forest Service to conduct a public-private competition prior to converting the CAT operation to the private sector. On Nov. 11, 2003, CAT employed 18 people; therefore, the Plaintiff argues, the plain language of the statute says a competition study was required.

Defendant argues that the conversion had already taken place by Nov. 11, 2003. It talks of "direct conversions," in which no study is done, versus "streamlined studies," which go more quickly, and "standard competitions," which are also referred to as "full-blown studies." OMB Circular A–76 governs this process.

Defendant moves to dismiss on jurisdictional grounds, arguing that this case is related to the process of bidding for a government contract, thereby vesting the Court of Federal Claims with exclusive jurisdiction under the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320. It contends Plaintiff has not suffered an injury in fact, and even if it has, the injury is not within the zone of interests of the relevant statutes.

Although there is no case law directly on point, the better jurisdictional argument is made by Plaintiff. While this case implicates a government procurement process, it does not challenge the process or the outcome of the process. I find that it is outside the ambit of ADRA, and that I have jurisdiction under the Administrative Procedure Act.

The standing arguments made by the government are more compelling, however. The Plaintiff is unable to articulate an injury sufficient to create standing. Assuming the injury is concrete and legally cognizable, there is no causal connection between the government's action and the injury. Finally, even if the Plaintiff has Article III standing, its injuries do not fall within the zone of interests of either § 340(e) or FAIR. For these reasons, I am granting the government's motion to dismiss.

In keeping with the scheduling order, the parties have moved for summary judgment. The government incorporates its arguments on jurisdiction and standing into its summary judgment brief. I am denying the summary judgment motions as moot, in light of my dismissal under Rule 12(b)(1), Fed.R.Civ.P.

Plaintiff also filed a motion to strike the Defendant's supplemental brief supporting its motion to dismiss on the grounds that it did not comply with Local Rule 7.1(j). There was a flurry of cross-motions early in the case, in the midst of which Plaintiff filed an amended complaint, adding a new claim. It was to this new claim that Defendant filed its supplemental brief. While it may not have complied exactly with the local rules, it substantially complied.

Moreover, the argument made in that brief has been made elsewhere. I am therefore denying Plaintiff's motion to strike.

## II. BACKGROUND

Plaintiff Forest Service Employees for Environmental Ethics (FSEEE) is a non-profit organization that describes itself as an overseer of the Forest Services' commitment to land stewardship. It relies for standing on its members who are (or were) Forest Service employees and members of the Content Analysis Team (CAT), and its members who comment on Forest Service projects.

The vast majority of the CAT team members were term employees; all but three of those employees' terms expired by January 2004. Declaration of Jody Sutton, Exhibit A, Defendant's Response to Plaintiff's Motion for Summary Judgment, Part I, ¶ 4 (May 18, 2004). The remaining three are on term contracts that expire in February 2006; the Forest Service has provided them employment elsewhere in the Missoula Regional Office. *Id.* Four of the remaining CAT team members are permanent employees. *Id.* ¶ 5. Two of those have been offered employment elsewhere in the Forest Service Regional Office in Missoula. *Id.* Two are undergoing relocation with the Forest Service, and will be reassigned if they do not find positions in the geographical area they have requested. *Id.* The Forest Service did not invoke its Reduction in Force authority for any CAT team member. *Id.*

The Forest Service initially described the CAT conversion in this public release:

Initially it was decided that a full study of CAT was needed for competitive sourcing. However, the term appointments of many CAT's employees would end before that study was completed. It then appeared that doing a streamlined study would suffice, but it didn't take long to recognize that there were too many variables in CAT's program for it to lend itself to a streamlined study. So the agency returned to the idea of a full study and potentially extending the terms of those employees whose terms would expire. Shortly into the study the agency realized that, even if CAT should win the competition, it would still not solve the myriad other questions regarding CAT, and it would require the agency establish approximately 50 new permanent positions during a time of possible workforce reductions. Furthermore, it was widely recognized that the mere fact that CAT had already succeeded as an enterprise team clearly demonstrated that there was potential for commercial contracting. Therefore the decision was made to convert CAT directly to contract.

USDA Forest Service, *Briefing Paper for CAT's Direct Conversion* (April 20, 2003). The government's failure to conduct a cost comparison study prior to deciding to outsource the CAT functions is undisputed.

The Forest Service solicited private sector offers to perform CAT team functions on November 3, 2003. Exhibit 8, Defendant's Motion to Dismiss. On November 25, 2003, the Forest Service extended the due date for proposals until January 5, 2004. Exhibit 9, Defendant's Motion to Dismiss. Plaintiff filed its complaint December 8, 2003, prompting the agency to extend the due date to March 8, 2004. Exhibit 10, Defendant's Motion to Dismiss. Proposals were submitted and the solicitation closed on March 8, 2004.

Only jobs that are "commercial" in nature can be privatized. The Federal Activities Inventory Reform Act (FAIR) directs federal agency directors to categorize jobs within their agencies as "commercial" or "inherently governmental." P.L. 105–270, 112 Stat. 2382 (1998), *reprinted in* 31

U.S.C. 501 (Historical and Statutory Notes), § 2. FAIR allows "interested parties," including employees of an organization within an agency, to administratively challenge omissions or inclusions of particular activities on a FAIR list within 30 days after publication. *Id.* §§ 3(a), (b). Plaintiff's CAT team members are "interested parties" under FAIR who could have challenged the categorization of their jobs as "commercial" rather than "inherently governmental." *Id.* § 3(b). Private contractors who are "actual or prospective offerors" may also bring administrative challenges. *Id.*

The Forest Service listed the CAT team functions as "commercial." Neither Plaintiff nor any CAT team member administratively challenged the listing of CAT team functions as "commercial."

## III. SUBJECT MATTER JURISDICTION

The motion to dismiss for lack of subject-matter jurisdiction hinges on whether this is a request for judicial review of a decision related to a federal procurement. If it is, jurisdiction lies solely in the Court of Federal Claims pursuant to the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491 (ADRA).

Plaintiff claims it is requesting judicial review under the APA, unrelated to the process of soliciting bids or awarding contracts. It contends the Forest Service has violated the plain language of a statute, Pub.L. 108–108, § 340(e), by converting the functions of its Content Analysis Team (CAT) to privately contracted services without first performing a cost comparison study. It does not want to be awarded the contract, nor does its claims relate to the process of contracting or soliciting contracts.

The government also contends Plaintiff is an "interested party" under ADRA because some of its members upon whom it relies for standing have been offered or will be offered work by several of the private contractors who responded to the Forest Service's Request for Proposals. The government's position is that if the Plaintiff's standing is derivative of CAT members, and the CAT members are "interested parties" because they are "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Federation of Government Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir.2001).

Plaintiff registered on the FedBizOpps website as a small business vendor interested in the solicitation for the CAT team functions. Plaintiff states that it did so merely to stay informed of developments related to the solicitation offer, not to submit a proposal. The government submitted a copy of an email from FSEEE Executive Director Andy Stahl to CAT members dated October 9, 2003, which says:

> FSEEE may submit a bid in response to the Forest Service's solicitation. We would undertake this task only if there is a significant interest from existing CAT employees in joining with us in submitting the bid. As far as we're concerned, CAT's current employees are the best qualified to do CAT work.

Exhibit 2, Supplement to Defendant's Brief in Support of Motion to Dismiss. In other words, FSEEE considered bidding for the CAT contract, and took the necessary initial steps to do so by registering on the government website and contacting CAT team members. The government relies on this evidence to argue that Plaintiff is an "interested party."

The bidding period closed March 8, 2004. Plaintiff did not submit a bid, but several vendors who did submit bids have

offered or intend to offer work to existing CAT team members. The names of those individuals as well as the companies that submitted bids were filed with the Court under seal, as it is confidential procurement information. Plaintiff has not responded to the government's contention that it is an interested party due to the fact that certain CAT members are indirectly bidding on the CAT contract.

The government contends that jurisdiction for this claim rests in ADRA, which provides:

Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C. § 1491(b). Although the statute provides for concurrent jurisdiction in the district courts and the Court of Federal Claims, the district courts' jurisdiction ended on January 1, 2001. Pub.L. 104–320, section 12(d); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed.Cir.2001).

Prior to ADRA, judicial review of bid protests depended on whether the plaintiff brought a pre-award protest or a post-award protest. The former was heard in the Court of Federal Claims, while the latter was reviewed under APA standards by district courts, pursuant to *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). ADRA gave joint jurisdiction to both courts. It allowed the Court of Federal Claims as well as district courts to hear post-award and pre-award disputes, allowed the Court of Federal Claims to provide declaratory or injunctive relief, and provided that review shall take place under APA standards. 28 U.S.C. § 1491(b). However, it also provided that district court jurisdiction would sunset in 2001 unless Congress acted to extend it, which it did not.

### A. Is this a "Bid Protest"?

Whether the district courts have completely lost their *Scanwell* jurisdiction, i.e., the power to review bid protest cases under the APA, is not settled. *See* Peter Verchinski, *Are District Courts Still a Viable Forum for Bid Protests?*, 32 Pub. Contract Law J. 393 (2003). In order to fall within the province of 1491(b), a case must be:

1) brought by "an interested party," and

2a) object to a solicitation by a Federal agency for bids or proposals for a proposed contract, or

2b) object to a proposed award or the award of a contract, or

2c) allege a violation of a statute or regulation in connection with a procurement or a proposed procurement.

The government's position is that FSEEE is an interested party, and alleges "a violation of a statute in connection with a proposed procurement." While this statutory language is very broad and could conceivably cover the action herein, courts have interpreted it more narrowly than that, restricting it to claims challenging the bidding or contracting processes, i.e., "bid protests."

This is the teaching of a case cited by the government, *City of Albuquerque v. U.S. Dept. of Interior,* 217 F.Supp.2d 1194 (D.N.M.2002). There, the plaintiff alleged that the government violated an Executive Order directing the federal government to give preference to a "centralized business community" when it solicited bids and awarded a contract for office space. The city did not bid for the contract, nor did it want the contract. It wanted the federal government to locate its offices in the city, and it argued that the Executive Order required that. In dismissing for lack of jurisdiction, the district court looked at the underlying action challenged by the city, not the law allegedly violated. "This is an objection to the manner of solicitation for bids by the DOI, a federal agency, and that agency's alleged violation of an executive order and corresponding federal regulations in connection with a procurement." 217 F.Supp.2d at 1196. Because the challenge was to the solicitation and award process, it fell within the exclusive jurisdiction of ADRA—even though it also fell within the smaller universe of *Scanwell* cases.

■ Under this reasoning, it is irrelevant whether *Scanwell* jurisdiction has been retained by district courts or has been imported into ADRA. Had the government conducted a cost comparison and made a contract award based upon that, any displaced federal employees would be able to administratively appeal the decision to the GAO. OMB Circular A–76 and Sup-plemental Handbook, part I, ch. 3, § K. Judicial review at that point would indisputably be of a bid protest action, for which jurisdiction would lie exclusively in the Court of Federal Claims.

But Plaintiff's claim precedes that scenario. The government initiated a cost comparison study of the CAT function, then changed its mind and decided to proceed directly to outsourcing. No case presents quite this set of facts. The only case challenging a "direct conversion" to a private contractor challenged not the directness of the conversion but the constitutionality of the statute allowing such conversions if the private contractor was a Native American corporation. *American Federation of Government Employees, AFL–CIO v. U.S.,* 104 F.Supp.2d 58 (D.D.C.2000), Moreover, the case took place prior to the sunset provision of ADRA.

I do not believe the fact that some CAT members have been offered employment from private contractors changes the analysis. They have been offered employment; they have not made a bid for the CAT contract. The fact that FSEEE registered as a prospective vendor, and indicated to its members that it may bid on the CAT contract, poses more difficulties. However, it did not bid on the contract, and is not challenging the process or the outcome.

The government points out that the Plaintiff's motion for a preliminary injunction sought to enjoin the government from proceeding with the procurement of services for CAT functions. According to the government, "Enjoining the CAT procurement is the *raison d'etre* of this lawsuit." However, the government overlooks the fact that Plaintiff sought to preliminarily enjoin the CAT procurement pending this Court's decision on the merits, and presumably, pending completion of the re-

quired cost comparison study. Plaintiff does not seek to permanently enjoin the CAT procurement; it cannot, for its alleged injury is procedural only.

The better argument is presented by Plaintiff. The basis of Plaintiff's claim is that the government ignored the law in directly converting the CAT functions. This is not a bid protest, and jurisdiction lies in this Court. I am therefore denying the government's Motion to· Dismiss on jurisdictional grounds.

## IV. STANDING

Having concluded that the Court retains jurisdiction over this lawsuit, I must determine whether the Plaintiff has standing. The judicial power of the United States courts is limited to the resolution of "cases" or "controversies." U.S. Const. Art. III, § 2, cl. 1. No justiciable case or controversy exists unless the plaintiff has standing to sue. "[A]t an irreducible minimum ... the party who invokes the court's authority [must] 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is fairly likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Standing is "a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The point of the standing inquiry is to ensure not only that the parties have a "personal stake" in the outcome but also to ensure that the courts do not extend their reach into the province of the legislative and executive branches. *Valley Forge,* 454 U.S. at 473–74, 102 S.Ct. 752.

To establish standing, Plaintiff must first show that it has suffered or will suffer an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Allegations of speculative future injury do not suffice. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). A future injury satisfies the "imminence" requirement only if the injury is "certainly impending." *Lujan,* 504 U.S. at 565 n. 2, 112 S.Ct. 2130.

Second, to show that the alleged injury is "fairly traceable" to the challenged action, the plaintiffs must make a reasonable showing that "but for" defendant's action the alleged injury would not have not occurred. *Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Ellsworth Assocs. v. United States,* 926 F.Supp. 207 (D.D.C.1996) (contractor lacked standing to challenge constitutionality of SBA set-aside program because its inability to compete for a contract stemmed from fact that its eligibility had expired, not from set-asides). Lastly, to prove that the alleged injury is likely to be redressed by a favorable decision, the plaintiff must show that a favorable decision would likely afford it relief from the injury. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

The Supreme Court has consistently held that "a plaintiff raising only a generalized grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Defenders of Wildlife,* 504 U.S. at 573–74, 112 S.Ct. 2130. Moreover, "a

mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Additionally, under the APA a plaintiff's injury must fall within the "zone of interests" of the relevant statute. 5 U.S.C. § 702. "The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). In other words, a plaintiff may be injured by an agency's failure to abide by the law and still be unable to obtain judicial review of the government's action.

In *Block v. Community Nutrition Institute,* for instance, the Supreme Court held that milk producers and handlers could challenge agency disregard of a dairy marketing law, but consumers could not. 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). The Court relied on the fact that Congress allowed producers and handlers—but not consumers—to bring administrative challenges as evidence that consumers were not within the "zone of interests" sought to be protected by the relevant statute:

> Congress channeled disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them. Had Congress intended to allow consumers to attack provisions of marketing orders, it surely would have required them to pursue the administra-

tive remedies provided in § 608c(15)(A) as well.

*Id.* at 347, 104 S.Ct. 2450.

## A. Procedural Injury

 "To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that 'the procedures in question are designed to protect some concrete interest of his that is the ultimate basis of his standing.' " *Cantrell v. City of Long Beach,* 241 F.3d 674, 679 (9th Cir. 2001). For example, in cases under the National Environmental Policy Act (NEPA), a plaintiff must demonstrate a "geographic nexus" between himself and the area affected by the environmental impact statement. *Lujan,* 504 U.S. at 566–67, 112 S.Ct. 2130.

The Supreme Court has explained "procedural injury" as follows:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. . . . What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

*Lujan,* 504 U.S. at 573, 112 S.Ct. 2130. In other words, it is not enough to identify something the government did wrong; a plaintiff must also suffer some harm *and* that harm must be to a legally protected interest. In NEPA cases, the plaintiff must live near the toxic waste dump, or drink the water that flows from it, or swim in the river into which wastewater is released.

Similar restrictions apply here. That the government is supposed to conduct a study prior to acting and fails to do so is not sufficient for standing purposes. The plaintiff must have a legally protectable interest that is harmed by the government's inaction.

Plaintiff asserts two types of injuries under two separate statutes. The § 340(e) injuries are first to Plaintiff's members who are (or were) CAT team employees, and second to Plaintiff's members who comment on Forest Service projects and have an interest in having those comments read and coded by federal employees. The FAIR injuries are claimed to be only to Plaintiff's members who comment on Forest Service projects and have an interest in having those comments read and coded by federal employees.

Plaintiff states that the relevant "procedures in question" are the outsourcing of inherently governmental activities and the lack of "heightened conflict of interest strictures" on non-federal employees, which Plaintiff asserts would injure its members who comment on Forest Service projects. I believe Plaintiff misstates its case, however. The procedures sought to be enforced are a cost comparison study under 340(e), and a reclassification of CAT team functions under FAIR. The first would not necessarily lead to a different outcome, i.e., the study could conclude that privatization of CAT functions will save the government money. The second would completely preclude privatization of CAT functions; functions that are classified as "inherently governmental" may not be outsourced.

Plaintiff FSEEE does not claim an independent injury to itself; thus, its injuries must be to its members. I will therefore examine the injuries first to the CAT employees and then to the FSEEE members who claim to be injured by non-federal workers reading and coding their public comments on Forest Service projects.

## B. CAT Employees' Standing: § 340(e)

 Employees have a right to continued federal employment absent just cause for their removal. *See Stone v. FDIC,* 179 F.3d 1368, 1375 (Fed.Cir.1999); *American Federation of Government Employees, AFL–CIO v. U.S.,* 104 F.Supp.2d 58, 69 (D.D.C.2000). The D.C. District Court held that plaintiffs were deprived of their interest in continued federal employment by the direct conversion to a private contractor, and that this deprivation caused a cognizable legal injury for standing purposes. *Id.*

 Two CAT employees are term employees whose terms do not expire until February 2006. Because their employment is not threatened to be terminated by anything other than the expiration of their terms, they have not alleged a cognizable injury in fact. Similarly, the permanent CAT employees who are still employed by the Forest Service have not suffered an injury in fact.

The majority of CAT employees were term employees whose terms expired by the end of January 2004. Because their employment ended as a result of the expiration of their terms, they have not suffered an injury that is directly traceable to the outsourcing of CAT functions. It is impossible to say with sufficient certainty that these employees would have continued

in their federal employment *but for* the outsourcing of CAT when their employment was set to expire regardless of outsourcing. Additionally, it is far too speculative for standing purposes to conclude that conducting a cost comparison study would have resulted in the renewal of these employees' terms.

Therefore, FSEEE has not suffered an injury in fact under 340(e) through its members who were CAT team employees.

## C. FSEEE Members Who Comment: § 340(e)

Although Plaintiff's initial claims emphasized injury to the CAT employees, its most recent briefs emphasize injury to its members who comment on Forest Service actions. The Plaintiff frames its interest as an interest in "neutral evaluation of public comments on USFS projects." Plaintiffs' Response Brief at 7. Plaintiff contends that private-sector employees may have conflicts of interest that will color their interpretation of public comment on Forest Service projects and lead to biased coding.

In support of standing, Plaintiff submitted the Declaration of James F. Curtis. Exhibit 2, Plaintiff's Reply Supporting PI. Curtis testifies that he has commented "several times on Forest Service proposals, especially those involving actions that I believe to have the potential for adverse environmental impacts." *Id.* ¶ 2. He further testifies, "When I submit comments to the government I expect that a government employee reads and considers what I have said. Government employees are civil servants who are supposed to work in the public interest, not for private corporate gain." *Id.* ¶ 3. Finally, he testifies:

> The Forest Service's proposal to contract with a private sector corporation for the job of reviewing public comments means that my comments will not be read by a government employee. Rath-

er, they will be analyzed by someone who is not working in the public interest, but for private corporate profit. Thus, my interests as a citizen in the management of public resources will be directly and adversely affected by the Forest Service's outsourcing of this critical governmental function.

*Id.* ¶ 4. Plaintiff contends that Congress enacted § 340(e) because it was concerned that the Forest Service was spending too much money on outsourcing "at the expense of critical, on-the-ground work such as the maintenance of Federal facilities." Plaintiff's Reply in Support of Motion to Strike at 3 n. 1. While that language can be found in the conference report, it is a stretch to conclude that Plaintiff's interest in using national forests was intended to be protected by Congress in 340(e). The Congressional conference report stated the following:

> Both the House and the Senate Committee reports expressed serious concern for the manner in which the Forest Service has implemented competitive sourcing studies. The managers remain very concerned and have provided instructions for the Forest Service and other agencies in section 340 of this Act, which replace the earlier instructions. *The managers understand that last year the Forest Service spent at least $18,000,000 on this effort without any prior notification of, or approval by, the Committees on Appropriations.* The managers understand that this effort will go forward during fiscal year 2004, but the Administration will provide more timely information to Congress and the public when undertaking competitive sourcing activities.

http://thomas.loc.gov/cgi-bin/cpquery/T? & report=hr330 & dbname-cp10 8 & (emphasis added).

The conference report also explained in regards to competitive outsourcing:

The managers support the underlying principle of the Administration's competitive sourcing initiative, which is that the government must continually strive to improve the efficiency of its operations and the delivery of the services it provides to the citizens of the United States. The managers are concerned that this far-reaching initiative appears to be on such a fast track that the Congress and the public are neither able to participate nor understand the costs and implications of the decisions being made. The managers remain concerned that the Administration has failed to budget adequately for the cost of the initiative and to justify such costs in budget documents. As a result, significant sums are being expended in violation of reprogramming guidelines and at the expense of critical, on-the-ground work such as the maintenance of Federal facilities. While millions have been spent to date, reprogramming letters have not been forwarded to the House and Senate Committees on Appropriations and funds have been diverted from important programs.

The managers have included bill language in Title III, General Provisions, outlining specific spending limits and reporting requirements for each program, project, and activity affected by the competitive sourcing initiative. These fiscal year 2004 funding instructions apply to all studies for which work has not yet begun, even though a department or agency may have previously announced plans to conduct such studies. The managers note that these requirements should not be construed as opposition to the careful and considered conduct of a competitive sourcing program. *The managers want to ensure that there is full disclosure on the use of appropriated funds in order to enable Congress and the public to evaluate the costs and tradeoffs involved in an initiative of this magnitude.*

http://thomas.loc.gov/cgi-bin/cpquery/T? & report=hr330 & dbname-cp10 8 & (emphasis added).

■ Plaintiff's injury via its members who comment on Forest Service projects appears to be an interest in the proper funding and administration of Forest Service lands and facilities—what is commonly referred to as a "generalized grievance" about the way the government operates. Plaintiff rebuts this by pointing out that very few citizens comment on Forest Service actions. However, the point is not how many citizens actually exercise their right to comment. It is instead that all citizens share the same legally protected interest in commenting on government actions, and no citizen has a legally protected right to have those comments read by particular people. Their complaint about potential conflicts of interest is wholly speculative, especially in light of the contractual requirements of disclosure statements, and the fact that those statements will be reviewed by a presumably objective federal employee.

Moreover, Plaintiffs do not argue—although they must under the second prong of the Article III standing test—that *but for* the agency's failure to conduct a cost comparison study, Forest Service lands and facilities would be better funded and administered.

Section 340(e) reflects Congress's displeasure with the Forest Service's failure to submit regular reports regarding competitive outsourcing. The statute directs the executive branch to take specific actions so that Congress has more information about the ways in which the executive branch is spending money. In other words, this appears to be a classic example of a statute that was enacted as a check on

another branch of government. It was not intended to create a private cause of action, and was not enacted for the benefit of any particular class of individuals.

Plaintiff has not suffered a concrete injury in fact, as neither it nor its members have a legal right to have their comments read by federal rather than private employees. Even if they had suffered such an injury, they have not established that their injury is "fairly traceable" to the government's failure to follow the direction of section 340(e). Finally, Plaintiff's injury is not within the zone of interests sought to be protected by section 340(e).

I therefore conclude that Plaintiff lacks constitutional as well as prudential standing to challenge the Forest Service's alleged failure to comply with section 340(e).

### D. FSEEE Members Who Comment: FAIR

█ Plaintiff appears not to be relying on its employee members for standing under FAIR. It describes its FAIR injury as follows:

> Curtis and other FSEEE members stand to lose the protections afforded them by the conflict-of-interest rules and ethical rules of conduct that apply to civil servants, but not to the private sector. If analysis of comments is outsourced to the private sector, FSEEE and its members will lose the affirmative obligations required of federal employees "to place loyalty to the Constitution, law and ethical principles above private gain." 5 CFR 2635.01.

Plaintiff's Response Brief at 4. Elsewhere the Plaintiff refers to its "concrete interests in having neutral civil servants review comments." *Id.* at 6. Plaintiff does not state the source of this concrete interest, nor can the Court discern such a source.

Neither Plaintiff nor its members have a right to control who reads their comments. The government has imposed conflict-of-interest and confidentiality restrictions on private contractors. It has taken steps to prevent the harm alleged by Plaintiff. Until and unless such a harm actually occurs, Plaintiff has not alleged a cognizable injury under FAIR.

## V. CONCLUSION

Although this Court has jurisdiction, the Plaintiff lacks standing to bring claims under § 340(e) or FAIR. For these reasons, IT IS HEREBY ORDERED:

(1) The government's motion to dismiss (Dkt.# 6) is GRANTED.

(2) Plaintiff's motion to strike (Dkt.# 16) is DENIED.

(3) Plaintiff's motion for a preliminary injunction (Dkt.# 3) and Plaintiff's motion for expedited hearing (Dkt.# 10) are DENIED.

(4) Defendant's motion for *in camera* inspection (Dkt.# 31), Defendant's motion for summary judgment (Dkt.# 25) and Plaintiff's motion for summary judgment (Dkt.# 28) are DENIED as moot.

The Clerk is directed to notify the parties of the making of this order.