**LABAT–ANDERSON, INC., Plaintiff,**

v.

**UNITED STATES, et al., Defendants.**

**No. CIV.A. 04–1826(JDB).**

United States District Court,
District of Columbia.

Nov. 22, 2004.

Thomas Leo McGovern, III, Hogan & Hartson, L.L.P., Washington, Counsel for plaintiff.

Stratton Christopher Strand, United States Attorney's Office for the District of Columbia, Washington, Counsel for defendants.

### *MEMORANDUM OPINION*

BATES, District Judge.

Plaintiff LABAT–Anderson, Inc., is a government contractor that provides distribution services at a supply depot operated by defendant Department of Defense. Defendants recently announced that they were not going to exercise the option on plaintiff's contract, and were instead going to convert the distribution services to in-house personnel on a temporary basis until the award of a new contract. In response, plaintiff filed a complaint in this Court and an application for a temporary restraining

order or a preliminary injunction, seeking an order preventing defendants from converting to in-house personnel without first performing the cost comparison and full solicitation of bids that plaintiff claims is required under the governing statutes and regulations. Defendants have responded with both an opposition to plaintiff's motion and a motion to dismiss for lack of subject matter jurisdiction arguing that this Court has no authority to hear plaintiff's claims pursuant to the sunset provision of the Administrative Dispute Resolution Act ("ADRA"), 28 U.S.C. § 1491(b)(1) & note.

Upon consideration of the parties' motions and the hearing held on November 10, 2004, the Court hereby grants defendants' motion to dismiss for lack of subject matter jurisdiction, denies plaintiff's application for a temporary restraining order or a preliminary injunction as moot, and transfers this action to the Court of Federal Claims.

### BACKGROUND

The Defense Logistics Agency ("DLA") is an agency of the Department of Defense that provides supply, technical and logistical support to the military services. One of the many responsibilities of the DLA is to provide an integrated pipeline for the distribution of supplies to United States forces throughout the world. Through its Defense Distribution Center ("DDC"), the DLA packs, packages, preserves, and marks the various materials and supplies necessary for the daily functioning of the armed services. The DDC operates through a network of 25 Defense Distribution Depots ("depots") located throughout the United States, Europe, the Pacific, and Southwest Asia.

In March of 1998, the DLA announced that it would initiate public-private competitions pursuant to Office of Management and Budget ("OMB") Circular A–76 to determine whether the distribution services at several of its depots could be performed more efficiently by the private sector. An A–76 competition is a two-step process. In the first phase, private contractors compete against one another to determine the "best value offerer." The bid of this "best value offerer" is then compared to the cost of providing the service with government employees, known as the agency's "most efficient organization" or "MEO." If the bid of the MEO is higher than the "best value offerer"—after the private bid is adjusted upward to ensure that the government does not convert to the private sector for marginal gains—the "best value offerer" wins the contract.

To date, twelve depots have undergone A–76 competitions, with the government's MEO winning six of the contracts, and the other six going to private contractors. On May 11, 2001, LABAT–Anderson, the plaintiff in this matter, won the competition for the depot at Cherry Point, North Carolina ("DDCN"). LABAT–Anderson's bid for the contract was $11.2 million, the lowest of all of the private contractors, and substantially lower than the MEO proposal of $20.8 million. After a two-month period for the resolution of any appeals, and a 120–day transition period, the DDCN contract commenced on December 1, 2001. The contract was for a base period of three years and contained a two-year option exercisable by the government.[1]

---

1. The option clause in the contract states: "The Government may extend the term of this contract by written notice to the Contractor within thirty days before the contract expires; provided, that the Government give the Con-

tractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension." Defs.' Mem. Supp. Mot. Dismiss

The difficulties the parties would later face regarding the DDCN contract can be traced to the months before the contract was even awarded to LABAT–Anderson. On December 8, 2000, the DLA had ordered DDCN to perform certain "detrash"[2] and other tasks for some buildings at Cherry Point that, although similar to other work already done by DDCN, had previously been the responsibility of other agencies in the Department of Defense. The DDC was to begin performing these additional duties in April 2001. Because the A–76 competition was almost complete at that point, the DDC therefore decided that if a private company were to win the contract, it would modify the contract to add the "detrash" and other new responsibilities ("add work") at that time.

Shortly after LABAT–Anderson was awarded the DDCN contract, the government's MEO appealed the award of the contract on the ground that LABAT–Anderson's estimated cost for the contract did not take into account the new "add work." The appeals were denied. After the transition period began on August 1, 2001, the DDC notified LABAT–Anderson of the add work, and the parties began negotiating a price for the new responsibilities. The parties were unable to agree on terms for the add work before the contract was set to begin on December 1, 2001. Nevertheless, LABAT–Anderson agreed to perform the add work while the parties continued to negotiate.

When the parties still had not reached an agreement on a price for the add work by March 2002, the DDC wrote to LABAT–Anderson declaring that the parties were at an impasse. The DDC announced that it would therefore unilaterally modify the contract to incorporate the add work at a unit price specified by the DDC itself. The DDC informed LABAT–Anderson that if it disagreed with the prices that had been set by the government, the parties could continue to negotiate or LABAT–Anderson, if it wished, could file a claim alleging a violation of the contract. *See* Def. Mem., Ex. D at 2.

The relationship between the parties deteriorated from there. In May of 2002, LABAT–Anderson informed the DDC that it would stop performing the add work unless there was a bilateral modification to the contract. After discussions between the parties, LABAT–Anderson agreed to continue performing the work while the parties attempted to work out their problems. From June 2002 to October 2003, DDC and LABAT–Anderson held a series of negotiation sessions in an effort to resolve the dispute over the add work and other disagreements that had arisen over time regarding the scope and terms of the contract. Even after the parties participated in an ADR session with an Armed Services Board of Contract Appeals judge, and the Commander of DDC and the President of LABAT–Anderson met to attempt to resolve their differences, the parties could not reach an agreement on the various disputes arising out of the contract.

The base period of the DDCN contract is set to expire on December 1, 2004. On September 30, 2004, the DDC contracting officer responsible for oversight of the contract notified LABAT–Anderson that the government would not be exercising the two-year option under the contract. "Considering price and other factors," the contracting officer explained, "exercising this

---

("Def. Mem."), Ex. B at 179. The option clause also cites 48 C.F.R. § 52.217–9, the federal regulation relating to options in government contracts.

**2.** "Detrash" entails unpacking an item and preparing it for distribution to a repair facility.

option is not considered to be the most advantageous method of filling the contract." Pl.'s Mem. Supp. Appl. T.R.O. & Prelim. Inj ("Pl. Mem.") at Ex. A. The contracting officer also announced that DDC would convert the DDCN distribution services to an Interim Government Organization ("IGO") in order to "cover these services until a new contract is awarded." *Id.*

LABAT–Anderson responded to the contracting officer the same day, offering to provide DDC with all of the services it currently performs at DDCN, including the add work, for a price of $425,000 per month. DDC nevertheless moved forward with the conversion to in-house personnel. On October 6, 2004, counsel for LABAT–Anderson wrote to counsel for DDC explaining its view that the conversion was a violation of Department of Defense procurement regulations and other governing law. The next day, the contracting officer for DDC contacted LABAT–Anderson, expressing a desire to enter into negotiations on terms for a possible extension of the contract beyond December 1, 2004. On October 21, 2004, after two weeks of unsuccessful negotiations, LABAT–Anderson filed a complaint in this Court seeking to block the conversion of distribution services at DDCN to in-house personnel.

Presently before the Court is LABAT–Anderson's motion for a temporary restraining order or a preliminary injunction, and the government's motion to dismiss for lack of subject matter jurisdiction. LABAT–Anderson argues that the DDC's conversion to in-house personnel without first issuing a solicitation for bids or conducting a cost comparison study violates the Administrative Procedure Act ("APA") because it is agency action that conflicts with several sources of applicable law, including a federal statute (10 U.S.C. § 2462), Department of Defense regula-

tions (32 C.F.R. §§ 169.4, 169a.10), an executive order (Executive Order 12615), and OMB Circular A–76, and is therefore agency action contrary to law under the APA. LABAT–Anderson argues further that the balancing of the equities favors preliminary injunctive relief.

The government counters that this Court lacks subject-matter jurisdiction under the sunset provision of the Administrative Dispute Resolution Act ("ADRA"), which terminates federal district court jurisdiction on January 1, 2001, and confers exclusive jurisdiction in the United States Court of Federal Claims, over any claim alleging a "violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1) & note. In the alternative, the government contends that many of the sources of law cited by plaintiff are unenforceable because they lack judicially manageable standards of review, and those authorities that are enforceable are not violated by any of defendants' actions. The government emphasizes that the conversion of DDCN distribution services to an IGO is a stop-gap measure to ensure the continued functioning of the United States armed forces in a time of war, and will remain in effect only for the time it takes the DDC to solicit private bids for the contract, a process that is presently in the early stages.

On November 10, 2004, the Court held a hearing on the parties' respective motions. Both motions have been fully briefed, and are ready for decision.

### ANALYSIS

■ The federal district courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S.

694, 701–702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). They enjoy the power to hear cases only to the extent authorized by the Constitution and Congress. *See Kokkonen,* 511 U.S. at 377, 114 S.Ct. 1673; *Ins. Corp. of Ireland,* 456 U.S. at 701–702, 102 S.Ct. 2099. It follows that a court must resolve any challenge to its jurisdiction before it may proceed to the merits of a claim. *See Galvan v. Fed. Prison Indus.,* 199 F.3d 461, 463 (D.C.Cir.1999) ("Jurisdiction must be established before a federal court may proceed to any other question."); *Tuck v. Pan Am. Health Org.,* 668 F.2d 547, 549 (D.C.Cir.1981) ("The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds.").

■ In particular, when presented with a motion for a preliminary injunction and a competing motion to dismiss for lack of jurisdiction, the Court must address the jurisdictional issues first, and may reach the merits of the motion for preliminary injunction only once, and only if, jurisdiction is established. *See, e.g., Penn. Mun. Auths. Ass'n v. Horinko,* 292 F.Supp.2d 95, 101 (D.D.C.2003) ("[P]laintiffs' preliminary injunction motion does not take priority over defendants' motion to dismiss for lack of jurisdiction. Jurisdiction, of course, is a threshold matter; without it, this court has no authority to decide other potentially dispositive issues in this case."); *Labat–Anderson Inc. v. United States,* 50 Fed. Cl. 99, 102 (Fed.Cl.2001) ("Subject matter jurisdiction is a threshold matter which must be addressed before the court reaches the merits of LABAT's motion for a preliminary injunction."). Therefore, the

Court will turn first to the question of its jurisdiction to hear plaintiff's claims.

■ As the party claiming that there is subject matter jurisdiction in this Court, plaintiff bears the burden of proving that it exists. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Georgiades v. Martin–Trigona,* 729 F.2d 831, 833 n. 4 (D.C.Cir.1984). It is presumed that a case does not lie within the Court's limited jurisdiction until the party asserting jurisdiction can show otherwise. *See Kokkonen,* 511 U.S. at 377, 114 S.Ct. 1673; *United States v. Hill,* 694 F.2d 258, 260 (D.C.Cir. 1982). Here, plaintiff bases its claim of jurisdiction on the argument that the action falls outside the "sunset provision" of the ADRA.

The ADRA was enacted in 1996 in part to reorganize the jurisdiction of the federal courts over bid protest cases and other challenges to government contracts. Prior to the ADRA, the Court of Federal Claims[3] and the federal district courts had enjoyed overlapping jurisdiction to hear these claims. At the time, the Court of Federal Claims was authorized to issue equitable relief in a contract claim against the United States only when the complaint was filed before the award of the contract. *See United States v. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983) (en banc).[4] In what came to be known as the *Scanwell* doctrine, federal district courts also heard claims under the APA challenging the award of government contracts. *See Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 861–73 (D.C.Cir.1970). Courts disa-

---

**3.** This is the current name of the court. Prior to 1992, it was known first as the United States Court of Claims and then the United States Claims Court.

**4.** The request for equitable relief, however, was—and still is—the essence of a claim challenging a government procurement, as a disappointed bidder is entitled to monetary damages only to the extent of its bid preparation costs. *See id.*

greed on the precise scope of jurisdiction under *Scanwell,* however: some held that it extended only to claims filed after the award of a contract, *see Rex Sys., Inc. v. Holiday,* 814 F.2d 994, 997–98 (4th Cir. 1987); *Opal Mfg. Co. v. U.M.C. Indus., Inc.,* 553 F.Supp. 131, 133 (D.D.C.1982), while others concluded that the federal district courts had jurisdiction over pre and post-award government contract cases alike, *see Ulstein Mar., Ltd. v. United States,* 833 F.2d 1052, 1057–58 (1st Cir. 1987); *Coco Bros., Inc. v. Pierce,* 741 F.2d 675, 677 (3d Cir.1984)

The ADRA streamlined this jurisdictional framework. First, the statute created a transitional period during which the federal district courts and the Court of Federal Claims would enjoy concurrent jurisdiction over government contract cases. The ADRA provided:

> Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). The legislative history confirms that this provision afforded the Court of Federal Claims and the federal district courts jurisdiction over "the full range of cases previously subject to review in either system." 142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (Sen. Levin).

The statute, however, contained a "sunset provision[ ]":

> The jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code [subsec. (b)(1) of this section] (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress.

28 U.S.C. § 1491 note. Senator Cohen, the sponsor of the sunet provision, explained that it was designed

> to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims.... The [legislation] would reverse the decision of the D.C. Circuit in *Scanwell*.... Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum.... *Scanwell* jurisdiction frustrates this purpose and deprives litigants of the substantial experience and expertise the Court of Federal Claims has developed in the [g]overnment contracting area.

142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen). As the Federal Circuit has explained, "it is clear that Congress's intent in enacting the ADRA with the sunset provision was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions." *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1079 (Fed.Cir.2001).

Plaintiff contends that the sunset provision does not apply to the present dispute because this is not a challenge to government action "in connection with a procurement or proposed procurement." Plaintiff maintains that this language must be read in light of the legislative history of the

statute, which it says reveals an intent to terminate federal district court jurisdiction over only "bid protests." This case is not a bid protest, it argues, because the government chose not to make a solicitation or allow bidding by private contractors before bringing the DDCN distribution services in-house. Accordingly, plaintiff claims, this Court retains jurisdiction to hear this case despite the ADRA sunset provision, under the broad grant of jurisdiction over federal claims in 28 U.S.C. § 1331 and the waiver of sovereign immunity in the APA. Pl.'s Rep. Mem. Supp. Appl. T.R.O. & Prelim. Inj. ("Pl.Rep.Mem.") at 3–7.

 The interpretation of a statute, however, begins with its plain text, and proceeds to its legislative history and purpose only when the text is ambiguous. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 124 S.Ct. 1587, 1595, 158 L.Ed.2d 338 (2004) ("Because we have held that the text of the statutory reservation clearly excludes sand and gravel, we have no occasion to resort to legislative history."); *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear").[5] Here, the ADRA and the sunset provision make no mention at all of "bid protests." Indeed, the language in the statute is far more expansive, embracing not only any challenge to "a solicitation by a Federal agency for bids," or "a proposed award" or "the award of a contract," but also "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). Even if the first three clauses might be thought to reach "bid protests" but no further, it strains credulity—

and the plain text of the statute—to read the final, blanket clause in as cramped a manner as plaintiff suggests.

Other courts to address the "in connection with" clause agree that it is expansive. The Federal Circuit has characterized the language as "very sweeping in scope," and has emphasized that it "does not require an objection to the actual contract procurement." *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir.1999). Instead, "[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction" in the Court of Federal Claims pursuant to section 1491(b)(1). *Id.* The Court of Federal Claims has read the term "procurement" to encompass "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with the contract completion and close-out." *Labat–Anderson*, 50 Fed.Cl. at 104.

Accordingly, courts have consistently read the ADRA to encompass cases like this where the government never undertook a public competition for the contract—and thus there was no bid process to protest—but the challenged conduct was otherwise "in connection with a procurement or proposed procurement." *See, e.g., Corel Corp. v. United States*, 165 F.Supp.2d 12, 22 (D.D.C.2001) (finding ADRA applies to challenge by software company to decision to convert exclusively to Microsoft software without a full and open competition); *Phoenix Air Group, Inc. v. United States*, 46 Fed.Cl. 90, 101 (Fed.Cl.2000) (holding that ADRA encompasses complaint filed by incumbent subcontractor alleging that the government

---

**5.** The plainness of statutory language "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as

a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

was violating the law "by its sole-source acquisition of training flight services ... without any competition").

In one particularly telling case, the Defense Information Systems Agency failed to renew the plaintiff's computer maintenance contract, and gave the work instead to a competitor without a public competition by modifying the terms of that competitor's contract. *See CCL, Inc. v. United States*, 39 Fed.Cl. 780, 789 (Fed.Cl.1997). The Court of Federal Claims concluded that the plaintiff's suit against the government fell within the ADRA because that statute "permits both a suit challenging government action which is self-consciously a competitive procurement as well as what CCL is claiming here: that DISA is *procuring* goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is *in violation of law.*" *Id.* (emphasis added). As these cases suggest, there is no warrant in the text of the ADRA or in precedent for applying the statute only to cases where a contract has been awarded as the culmination of a bidding process.[6]

Similarly, there is no warrant for such a narrow interpretation in any other interpretive aide. Plaintiff relies heavily on the appearance of the word "bid protest" in the legislative history of the bill that became the ADRA. Even if this Court were inclined to look beyond the text of the ADRA to the legislative history for evidence that Congress intended to confine the statute to "bid protests," that history is not nearly so helpful to plaintiff's argument as plaintiff suggests. At the outset, one of the sponsors of the bill characterized it as giving the Court of Federal Claims exclusive jurisdiction "over procurement protests," a fact that the Federal Circuit has viewed as evidence that the sponsors of the bill did not intend to confine the statute to "bid protests."[7] *See Emery Worldwide Airlines*, 264 F.3d at 1080 ("Senator Levin, who introduced the ADRA legislation, recognized that the sunset provision applied not only to bid protests, but to procurement protests in general."). Of course, where legislators chose to use the term "bid protests," it is far from apparent that they meant to place the same limiting definition on the phrase as plaintiff would here.

**6.** The only case cited by plaintiff where a court held that the ADRA did not apply to a claim challenging the award of a government contract is *Forest Serv. Employees for Envtl. Ethics v. United States Forest Serv.*, 338 F.Supp.2d 1135, 1141 (D.Mont.2004). The court in that case emphasized, however, that the plaintiff did not bid or seek the contract itself, and therefore could not be viewed as challenging the actual procurement process. *See id.* ("The fact that FSEEE registered as a prospective vendor, and indicated to its members that it may bid on the CAT contract, poses more difficulties. However, it did not bid on the contract, and is not challenging the process or the outcome."). Here, plaintiff wishes to continue providing distribution services at DDCN.

Plaintiff also relies on a line of cases involving the suspension of private contractors, the

False Claims Act, and the Service Contract Act. *See* Pl. Rep. Mem. at 8–10. Almost all of these cases pre-date the ADRA, and those that post-date it do not discuss the jurisdiction of the court under the ADRA at all. At any rate, the Court need not decide today whether these decisions involving disputes over the terms or execution of government contracts or the legal status of private contractors fall within the ambit of the ADRA. It is enough to say that these cases, unlike the matter before the court, do not involve a challenge to the award of a government contract or the procurement process itself.

**7.** *See, e.g.*, 142 Cong. Rec. S11849–50 (daily ed. Sept. 30, 1996) (statement of Sen. Levin) ("After 4 years, the jurisdiction of the district courts would terminate, and the Court of Federal Claims would exercise judicial jurisdiction over procurement protests.").

In truth, the only proposition that is clear from the legislative history of the statute is that the sponsors intended the ADRA to overrule the D.C. Circuit's decision in *Scanwell.* *See* 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen) ("The [legislation] would reverse the decision of the D.C. Circuit in *Scanwell*"); *id.* ("*Scanwell* jurisdiction . . . deprives litigants of the substantial experience and expertise the Court of Federal Claims has developed in the Government contracting area."). But the *Scanwell* doctrine was not limited to what might formally be regarded as "bid protests." Instead, under *Scanwell* the federal district courts were available for any challenge to the award of a government contract as arbitrary and capricious or in violation of the law under the APA. *See, e.g.*, *Scanwell*, 424 F.2d at 864 ("The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity."); *Aero Corp. v. Dep't of the Navy*, 558 F.Supp. 404, 416 (D.D.C.) (holding that *Scanwell* applies to APA challenges to "procurement decisions," including the government's decision in that case to grant a contract on a "sole-source" basis without competition).

The Court of Federal Claims otherwise enjoyed exclusive jurisdiction over contract claims against the United States in excess of $10,000.[8] 28 U.S.C. § 1491(a)(1). When Congress elected to overrule the *Scanwell* doctrine and vest jurisdiction over *Scanwell*-type cases in the Court of Federal Claims as well, there is no reason to believe that it intended to leave in the federal district courts the small subset of challenges to the procurement process where there was no "bid protest." That interpretation would hardly be consistent with the expressed intent of the sponsors to avoid "the fragmentation of [g]overnment contract law" and to "increase the efficiency of our procurement system." 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen). Instead, the more persuasive result is the one apparent on the face of the statute: All challenges to the award or proposed award of government contracts, including challenges in connection with government procurements, were to be consolidated in the Court of Federal Claims.

At any rate, this debate over the legislative history can comfortably be set aside. The Court is convinced that if Congress intended to confine the statute to bid protests, it could easily have stated so in the statute, instead of using the sweeping "in connection with a procurement" language it employed. *See United States v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C.Cir. 2004) (instructing that courts must "adhere to the plain language of the statute, rather than invoke the legislative history to embrace a reading at odds with the statutory text"); *Recording Indus. Ass'n of Amer., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 127 (D.C.Cir.2003) ("Legislative history can serve to inform the court's reading of an otherwise ambiguous text; it cannot lead the court to contradict the legislation itself."). The task of this Court is not to parse the meaning of the term "bid contract" as it was occasionally used in floor speeches, but instead to ascertain the meaning of the text of the statute as it was enacted by Congress, and determine whether it applies to the facts of this case.

█ Turning to the latter inquiry, the Court has little difficulty concluding that

---

**8.** The "Little Tucker Act," 28 U.S.C. § 1346(a)(2), confers jurisdiction on district courts for claims of $10,000 or less.

plaintiff's complaint alleges a "violation of statute or regulation in connection with a procurement or proposed procurement." Indeed, everywhere plaintiff turns, there is a procurement in this case. The conduct that plaintiff is challenging is the decision by the government to terminate its contract with plaintiff for the provision of DDCN distribution services (a "procurement" contract) and instead to convert the services to a government IGO (arguably a "procurement") while the government prepares for a full re-competition of the DDCN contract to a private contractor (certainly a "procurement or proposed procurement"). It is fair to say that this dispute sits among a series of procurements and proposed procurements. *See Labat–Anderson*, 50 Fed. Cl. at 104 (procurement for purposes of ADRA includes "all stages of the process of acquiring property or services").

In addition, the legal claims raised by plaintiff are in every relevant respect a challenge to the procurement process. The statutes and regulations that plaintiff alleges the government has violated have been described by the D.C. Circuit as "federal procurement law." *See Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1272–74 (D.C.Cir.1998) (discussing 10 U.S.C. § 2462 and 32 C.F.R. § 169a.4(d)); *RAMCOR*, 185 F.3d at 1289 ("As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."). Plaintiff itself alleges in its pleadings that it has been "deprived of its right to a legally valid procurement process." Compl. ¶ 9. Finally, the remedy plaintiff seeks is a competitive procurement: specifically, that the government issue a "solicitation . . . for a follow-on competition" for the DDCN distribution services contract before converting to in-house personnel. Compl. at 13. In short, this dispute arises out of, is a challenge to, seeks as a remedy concerning, and in ev-ery relevant respect has a "connection" with a procurement or proposed procurement.

Plaintiff objects that the government's award of a contract in-house without a competition is not a "procurement" of services because the government is choosing to perform the services itself. Pl. Rep. at 6. Of course, even if true, that is beside the point because the in-house award is still "in connection with" the upcoming recompetition of the DDCN contract, *i.e.*, with a proposed procurement. However, it is not true. Plaintiff's argument leads to the curious result that this Court lacks jurisdiction over a challenge to a fully competitive solicitation of bids for a government contract when a private contractor wins the contract, but this Court enjoys jurisdiction over a challenge to an identical solicitation process when the government's MEO wins the contract (because there is no "procurement," and so the ADRA does not apply). The Court does not believe that the ADRA remotely contemplates these kinds of distinctions in the outcome of what is plainly a procurement process.

And if plaintiff were to admit, as counsel at the hearing indicated it might, Tr. at 29, that such a case would qualify as a "procurement" under the ADRA because there was a public competition for the bid, then they are forced to tighten their proposed exception to the ADRA to the small subset of cases where a contract is awarded to a government MEO without any competitive bidding at all. Once again, however, plaintiff does not supply any authority for recognizing such a narrow and a textual exception to a statute that was enacted with the opposite goal: eliminating exceptions to the jurisdiction of the Court of Federal Claims and producing uniformity in the treatment of government contract disputes. The sweeping text of the ADRA, with its several overlapping claus-

es, simply does not allow the exception that plaintiff would read into the statute: Even if the award of a contract to in-house personnel without a competition did not quite fall within the meaning of a "procurement," it would certainly qualify as an "award of a contract" within the meaning of the preceding clause of the ADRA, and therefore the statute would oust this Court of jurisdiction in any event.

Inasmuch as the ADRA governs cases where a plaintiff alleges that the government awarded a contract to a *private contractor without* a public competition in violation of the law, *see, e.g., Corel Corp.*, 165 F.Supp.2d at 22; *Phoenix Air Group*, 46 Fed.Cl. at 101, and plaintiff admits that the ADRA applies to cases where a plaintiff alleges that the government awarded a contract *in-house after* a public competition in violation of law, there is no reason to create an exception for awards of a contract *in-house without* a public competition. *See CCL, Inc.*, 39 Fed.Cl. at 789. At the very least, there is no reason to do so in a case such as this where, as explained *supra*, the very gravamen of plaintiff's claim is that a procurement competition was necessary before the contract was awarded in-house, and every other aspect of the dispute—the relief sought, the conduct challenged, and the statutes and regulations giving rise to the claim—is connected to a procurement or proposed procurement as well.

For these reasons, the Court concludes that this case falls under the sunset provision of the ADRA, and therefore lies in the exclusive jurisdiction of the Court of Federal Claims. Plaintiff acknowledges that there is no relief it can obtain here that it cannot receive in the Court of Federal Claims. Tr. at 25–26. Plaintiff will therefore have every opportunity to fully litigate its claims in the forum designated by Congress for these actions. Finally, "in the interest of justice," this civil action will be transferred to the Court of Federal Claims to cure the want of jurisdiction found in this Court. *See* 28 U.S.C. § 1631.

## CONCLUSION

Defendants' motion to dismiss for lack of subject matter jurisdiction is granted. Plaintiff's motion for a temporary restraining order or in the alternative a preliminary injunction is denied as moot. This action is transferred to the Court of Federal Claims. A separate order will issue.